**Opinion issued December 5, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

### NO. 01-12-00926-CR

———————————

**RUSSELL REED JOHNSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Case No. 10CR1522**

# O P I N I O N

A jury found appellant, Russell Reed Johnson, guilty of the offense of

aggravated sexual assault of a child[1] and assessed his punishment at confinement

---

[1]    *See* TEX. PENAL CODE ANN. § 22.021 (Vernon 2012).

for seven years. In one issue, appellant contends that the evidence is legally insufficient to support his conviction.

We affirm.

## Background

The complainant testified that when she was thirteen years old in July 2009, the Johnson family, whom she knew from their church in Stephenville, Texas, invited her on their family vacation to Texas City. Because appellant's step-daughter was her best friend, the complainant accepted the offer. However, while they were staying with Steve and Andrea Phillip in Texas City, appellant sexually assaulted the complainant.

Ten people were in the Phillips' house at the time of the assault: Steve and Andrea Phillip and their son; appellant and his wife, Melanie Johnson, and their four children; and the complainant. The complainant explained that she and appellant's step-daughter were to sleep on a sleeper-sofa mattress on the living room floor, but during the first night at the Phillips' house, she asked that an adult stay in the living room until she fell asleep. Appellant volunteered and slept on the mattress between the two girls. The complainant explained that when she awoke in the middle of the night, appellant's hand was inside her shirt, in between her breasts. She did not tell any of the other adults because she decided to give appellant "the benefit of the doubt" and was uncomfortable talking about it.

2

The sleeping arrangements were the same the second night. In the middle of the night, the complainant awoke and found appellant's hand inside her shorts, touching her skin. Appellant moved his hand and placed his finger inside her vagina. When the complainant rolled over, appellant stopped, but neither of them said anything. She did not tell any adults about the assault because she was afraid of what might happen while she was far away from home if they did not believe her, and she had to go home with the Johnson family. She did text a friend, Robbie Messman, and told him that "something" was going on with appellant that made her "uncomfortable." Messman wanted to call the complainant's parents, but she "begged" him not to because she knew that it would "start a whole bunch of stuff" and her parents would "freak out."

On the third night, when the complainant awoke about 1:00 a.m., she saw Andrea Phillip sitting on the couch in the living room just above where she was lying on the mattress. As appellant and Andrea had a conversation, appellant put his hand inside the complainant's shirt and touched her breast. The complainant noted that the room was dark, with only a small light on in the kitchen next to the living room, and the bed had a big blanket that covered her, appellant, and his step-daughter. When the complainant started to cry, she heard Andrea comment to appellant that she thought the complainant was laughing in her sleep. After Andrea left the room, the complainant went to the bathroom and texted Messman

about the incident. When she came back to the living room, she laid down on the couch instead of on the mattress. When appellant asked her what was wrong, she told him that she was "sick and crowded" on the mattress. The complainant explained that she tried to stay away from appellant and close to his step-daughter during the rest of the trip because she and appellant "never got along."

The group returned to Stephenville on August 1, 2009, and the Johnson family dropped the complainant off at their church, where she went with her mother into a bathroom and told her only "part of what had happened" because she was embarrassed. The complainant told her mother that appellant had slept in the same bed with her and put his hand in her shirt. The complainant and her mother cried as they left the bathroom, and they told their pastor's wife, who saw them leaving, that appellant had placed his hand in the complainant's shirt.

The complainant further explained that although she later saw the Johnsons "around town," she no longer had a relationship with them. And she waited to tell about all that had happened with appellant because she hoped that she had told enough so that he would face a "consequence." However, when that did not happen, the complainant felt she had to tell her church youth leader, Marian Smith, so she could help the complainant tell her parents about all that appellant had done to her. The complainant did not feel any relief after she had told about all that had

happened; she just continued to feel embarrassed and "nasty" because her body had "biologically responded" when appellant touched her vagina with his finger.

The complainant further testified that she also had conversations with a friend, Melanie Cason, about the sexual assault. Although she could not remember what she specifically told Cason, she did remember telling her about the sexual assault. The complainant also explained that in early 2010, she told her teenage cousin, Crystal, and her adult boyfriend, Jason McSwain, about the sexual assault. And the complainant "developed feelings" for McSwain over the next several months because he was sympathetic to her, and they eventually had a sexual relationship.

The complainant's mother testified that she met appellant at church and became best friends with his wife, Melanie. She noted that the complainant and appellant's step-daughter became best friends and were "inseparable." The complainant spent a lot of time with appellant's family, would often spend the night at their house, referred to appellant and his wife as "Dad" and "Mom," and looked at appellant as a father figure. The complainant's mother explained that when the complainant returned with the Johnson family on August 1, 2009, the complainant told her some of what had happened during the trip, and they called her father at work to tell him. She also noted that it was about five more months before the complainant told them "the rest of what all happened."

5

Steve Phillip testified that during the Johnson's stay at his house, he and his wife slept in the master bedroom, his son and appellant's son shared a room, and appellant's wife and their baby slept in a "guest room." The complainant and appellant's step-daughter slept in the living room, and sometimes the boys and appellant's other daughter would sleep there too as it was a "common room" where people would just "pass out" after a day of activities. Mr. Phillip explained that at night, he left a ceiling fan light on in a breakfast area near the living room and the light lit "up most of the living room" when the "pocket door" between the kitchen and the living room was left open.

Mr. Phillip further testified that during the first night of the visit, the complainant and appellant's step-daughter slept on the sleeper-sofa mattress on the living room floor and appellant slept in a recliner in the living room. During the second night, appellant slept on the couch, not on the mattress on the living room floor. When he awoke the morning after the third night, Mr. Phillip saw appellant, his step-daughter, and the complainant sleeping on the mattress on the living room floor, with appellant in between the two girls. Because appellant's wife had been injured at the beach and had to go to an emergency room on the fourth day, appellant "was everywhere that night," upset and trying to take care of his wife. When Mr. Phillip awoke the next morning, he saw appellant asleep on the couch and the complainant and appellant's step-daughter asleep on the mattress on the

6

living room floor. On the final day, he awoke and saw appellant asleep in the recliner in the living room. Mr. Phillip explained that he had "no clue" as to whether anything had happened between appellant and the complainant at his house.

Andrea Phillip testified that although she did not know where everyone slept the first night, when she awoke in the morning, she saw appellant asleep in the living room on the couch or in a chair. On the second night, Mrs. Phillip saw appellant, his step daughter, and the complainant sleeping on the mattress in the living room. And when she awoke during the third night because she felt sick, she saw that appellant, his step-daughter, and the complainant were still awake and talking. She then stopped in the living room and talked with them for several hours. Mrs. Phillip explained that when she turned on the light in the kitchen it made the living room "pretty bright," and she could see everything in it. She noted that both girls were on their stomachs, appellant was lying on his back in between them, and there were no covers on the mattress; thus, she was able to see their "full bodies." When she awoke later that morning, Mrs. Phillip saw appellant, his step-daughter, and the complainant asleep on the mattress. She did not recall seeing any blankets on them.

Michael Cason testified that he was a friend of, and attended church with, the complainant's family and the Johnson family in Stephenville. He had been a

youth pastor at the church for a year and a half. In regard to the complainant's reputation for honesty in the community, he testified that she "is not an honest person. I wouldn't trust her." And Cason noted that when the Johnsons and the complainant returned from their trip, he was working on the sound system in the church. After the complainant came in with Melanie Johnson, she sat with him in the back row for twenty to twenty-five minutes and talked to him about her trip. She appeared "[v]ery happy, but tired."

Melanie Johnson, appellant's wife, testified that her family met and got to know the complainant's family at church and she gradually became best friends with the complainant's mother. She noted that on the first night in Texas City, the complainant and appellant's step-daughter slept on the living room floor and appellant slept in a recliner in the living room. The next night, after a day at a water park, appellant, his step-daughter, and the complainant slept on the mattress on the living room floor, with only small throw blankets and a few small pillows. And Mrs. Johnson noted that when they dropped off the complainant at the church at the end of the trip, the complainant was "very excited."

Appellant's step-daughter testified that she met and became friends with the complainant through their church. She noted that on the first night in Texas City, she and the complainant slept on the sofa mattress while appellant slept in the recliner in the living room. The second night, appellant slept between the two

girls, and the two boys slept in the living room with them. On the third night, after a day at the water park, appellant again slept between her and the complainant on the mattress. That night, Mrs. Phillip came in to the living room and they stayed up and talked, but the complainant slept while they talked.

Lindsey De La Cruz testified that she was a friend of the complainant's family and the Johnson family through their church in Stephenville. She noted that a few weeks after the Johnson family trip, the complainant told her that she had texted her mother while they were driving to San Antonio. And, in the text, the complainant informed her mother that appellant had "molested" her, but she did not need her mother to come get her.

Melanie Cason, a friend of the complainant and the daughter of Michael Cason, testified about conversations that she had had with the complainant after the Johnson family trip. In the first conversation, which occurred in late August or early September 2009, the complainant told her that she was nervous about a court appointment and appellant had "felt her up." During their second conversation in October, the complainant told her that she had not told the "complete truth" and appellant had "fingered her." During a later conversation in December 2009 or January 2010, the complainant told Carson that appellant had "raped" her, she was having sex with a 35-year-old man, and she had undergone a medical exam, which had revealed that she was "no longer a virgin." However, during a lunch at school

9

in 2012, the complainant told Carson in a "bragging" manner that she had "lied about it" and "[appellant] never touched me."

Appellant testified that he got to know the complainant and her family when they attended the same church in Stephenville. As the children got older, the complainant and his step-daughter became best friends. He noted that during the first night of their stay at the Phillips' house, he slept in the recliner in the living room and the complainant and his step-daughter slept on a mattress on the living room floor. The second night, appellant told the complainant and his step-daughter that he was going to sleep on the mattress because his back was sore, and the complainant told him to sleep in the middle. The two boys also slept in the living room that night. The third night, appellant, his step-daughter, and the complainant slept on the mattress on the living room floor, and the two boys slept in a bedroom. Also that night, Mrs. Phillip awoke and came into the living room to talk. A light was on over the table in the kitchen, and he was able to see Mrs. Phillip clearly as they talked. The next night, after his wife had had an accident at the beach, appellant stayed up late checking on her and looking at information on the internet. He explained that he then slept on the mattress with the complainant and his step-daughter, but he also sat in the recliner. And he noted that during the final night at the Phillips' house, he slept in the recliner in the living room, and the complainant and his step-daughter slept on the mattress on the floor. Appellant further testified

10

that he did not touch the complainant's breasts, touch her skin with his skin, or sexually assault her at any time.

Dr. Ralph Noble, a pediatrician for the University of Texas Medical Branch in Galveston, testified that he is the medical director for the Children's Advocacy Center and he examined the complainant's medical records from an examination performed on her at Cook Children's Hospital in Fort Worth on January 14, 2010. Noble explained that because the complainant was in the last stage of puberty, there would be a very low chance that any penetration would "show any abnormal findings of an injury." And there was no evidence of sexual abuse in the physical examination other than what the complainant had told the examiner. Noble noted that "it's the common thing for there to be a time lag between the actual time of molestation and the time that the child tells someone about it" and "many times the child is just ashamed and embarrassed to come forward with the outcry of being abused."

Denise Bennett, a therapist at the Advocacy Center of Galveston County, testified that she provides crisis counseling for child victims of abuse and the majority of children she helps give "delayed outcries." She explained that a "delay outcry" occurs when someone does not immediately disclose an event of abuse, and children can wait years to make an initial disclosure of abuse. Bennett also noted that abuse victims will give "partial disclosures" of events as well, usually

11

telling "the most minimal thing first" before later revealing more, because a partial disclosure can provide a means of gauging potential trouble and the consequences of their revelation. However, she noted, embarrassment often prevents full disclosure, and children will gauge the reaction of others and determine whether it is "safe" to disclose more. And child victims also delay disclosure until they feel that the perpetrator no longer has access to them. Bennett opined that it would not be unusual for a child who was on vacation with a trusted perpetrator to act as if there was nothing wrong and wait until they were no longer under the perpetrator's care to disclose the abuse. She also explained that there are some children who make false accusations about sexual abuse, and it would be possible for a child to make a false accusation to cover up a sexual relationship with another person.

## Sufficiency of the Evidence

In his sole issue, appellant argues that the evidence is legally insufficient to support his conviction because the complainant's allegations are uncorroborated by any other witness, "[t]here [i]s no physical evidence provided by the State," and the complainant "repeatedly and radically changed the specifics of her allegations." Appellant notes that there are factual inconsistencies throughout the record, and he asserts that, collectively, these inconsistencies "conclusively establish a reasonable doubt as to whether [appellant] in fact did commit the offense of which he was convicted." The State asserts that appellant is asking this Court to re-weigh the

evidence "solely in his favor" and ignore "the jury's resolution of conflicting evidence."

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979)). Evidence is legally insufficient when the "only proper verdict" is acquittal. *Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2218 (1982). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). In doing so, we give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Id.* We defer to the fact finder's resolution of conflicting evidence unless the resolution is not rational. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *See Williams*, 235 S.W.3d at 750.

Jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given the witness's testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981); *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). And, they may choose to believe or disbelieve any part of a witness's testimony. *See Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Likewise, "reconciliation of conflicts in the evidence is within the exclusive province of the jury." *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (quoting *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986)).

A person commits the offense of aggravated sexual assault of a child if the person intentionally or knowingly causes the penetration of the anus or sexual organ of a child by any means and the victim is under the age of fourteen. *See* TEX. PENAL CODE ANN. § 22.021 (a) (1) (B) (i), (2) (B) (Vernon Supp. 2013). And a conviction for the aggravated sexual assault of a child is "supportable on the uncorroborated testimony of the victim of the sexual offense." *See* TEX. CODE CRIM. PROC. ANN. art. 38.07 (Vernon Supp. 2013) (providing that if victim is age seventeen or younger, requirement that victim inform another person of alleged offense within one year does not apply).

Here, the complainant was thirteen years old at the time of the sexual assault. Although their testimony differed on the nights that appellant slept on the

14

mattress with the complainant and his step-daughter, every witness who was at the Phillips' house, including appellant, testified that appellant slept on the mattress in the living room between the two girls. The complainant testified that on the first night, she awoke to find appellant's hand down her shirt and between her breasts. On the second night, he put his hand inside her shorts and penetrated her vagina with his finger. On the third night, he again placed his hand down her shirt and touched her breasts. The complainant's testimony that appellant placed his finger inside her vagina is alone sufficient to support appellant's conviction for aggravated sexual assault of a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07.

Viewing the evidence in the light most favorable to the jury's verdict, as we must, we conclude that a rational trier of fact could have reasonably found that appellant committed the offense of aggravated sexual assault of a child and we defer to that finding.[2] Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction for aggravated sexual assault of a child.

---

[2]     Appellant essentially requests that we perform a factual-sufficiency review and re-weigh the evidence presented at trial. However, this Court, in *Ervin v. State*, decided that it will no longer conduct factual-sufficiency reviews of the evidence in criminal cases. 331 S.W.3d 49, 54 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). This Court based its decision on the Texas Court of Criminal Appeals' plurality opinion in *Brooks v. State*, in which the Court of Criminal Appeals determined that a legal-sufficiency standard of review is "indistinguishable" from a factual-sufficiency standard of review. 323 S.W.3d 893, 901 (Tex. Crim. App. 2010).

However, as explained by former Texas Supreme Court Chief Justice Tom Phillips:

15

We overrule appellant's sole issue.

---

> Appellate courts have the [constitutional] authority to review the sufficiency of the evidence in support of the fact finder's determination for one reason: to undo the effect of an unjust trial. *See generally*, Garwood, *The Question of Insufficient Evidence on Appeal*, 30 TEX. L. REV. 803, 809 (1952). This traditional judicial function, now exercised only by our intermediate appellate courts, neither conflicts with nor infringes upon the right of trial by jury. No appeals court in Texas has ever been given, or has ever exercised, the authority to find any fact. The extent of an appellate court's power is, as it has always been, to remand for new trial if more than a scintilla of probative evidence exists to support the result reached by the jury.
>
> This authority exists regardless of whether the court of appeals is reviewing a jury's finding or its "non-finding," that is, the failure of a jury to find a fact. In either case, the court is not substituting its own finding for the jury's; it is merely ordering a new trial before another jury for a new determination.
>
> The court of appeals must have this authority in order to do justice. Trials may be just as unfair when the party with the burden of proof unjustly loses as when the party with the burden of proof unjustly wins. To fulfill its constitutional responsibilities, the court of appeals must have authority to review both findings and non-findings. *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex. 1993).

*Herbert v. Herbert*, 754 S.W.2d 141, 145 (Tex. 1988) (Phillips, C.J., concurring).

The weakness of the evidence in the instant case reveals that Chief Justice Phillips was right. It further illustrates why this Court should reconsider its opinion in *Ervin* and the court of criminal appeals should reconsider its opinions in *Brooks* in light of the factual-conclusivity clause of the Texas Constitution, Texas Code of Criminal Procedure article 44.25, the court's own well-established prior precedent concerning the serious constitutional conflict that is now presented by its holding in *Brooks*, and the well-established precedent of the Texas Supreme Court with which *Brooks* collides.

**Conclusion**

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

Publish.  TEX. R. APP. P. 47.2(b).

Brown, J., concurring, except in footnote 2.