ACCEPTED
03-15-00116-CR
5971558
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/8/2015 7:52:39 AM
JEFFREY D. KYLE
CLERK

**No. 03-15-00116-CR**

IN THE

THIRD COURT OF APPEALS

AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

7/8/2015 12:06:39 PM

JEFFREY D. KYLE
Clerk

-------------------------------------------------------------------------------------------------

**CHRISTOPHER QUINN RIVERA**

**APPELLANT**

**V.**

**THE STATE OF TEXAS**

**APPELLEE**

-------------------------------------------------------------------------------------------------

APPELLANT'S BRIEF

-------------------------------------------------------------------------------------------------

**On Appeal from Cause No. CR-14-0448**
**In the 428th Judicial District Court, Hays County**
**Honorable William R. Henry, Judge Presiding**

Rickey D. Jones
Bar I.D. No. 00787791
1910 Pacific Ave, Ste 15100
Dallas, Texas 75201
Telephone: (214) 742-0708
Facsimile: (214) 742-5956
Email: rickey@satx.rr.com
Attorney for the Appellant

**Oral Argument is Respectfully Requested**

**Identity of the Parties and Counsel**

1

**Appellant**
Christopher Quinn Rivera

**Trial Counsel**
Mr. Erick Arthur Bovik
SBOT NO. 00792366
Bovik & Meredith, P.C.
P.O. Box 150129
Austin, Texas 78715
Telephone: 512-280-9096
Attorney for Defense

**Appellate Counsel**
Rickey D. Jones
SBOT No. 00787791
P.O. Box 142416
Austin, TX 78714
Telephone: (210) 710-7062
Fax: (866) 589-0541


**Appellee**
State of Texas

**Trial and Appellate Counsel**
DISTRICT ATTORNEYS
Mr. John David Couch
SBOT NO. 24048407
Ms. Jennifer Michelle Stalbaum
Hays County Criminal District Attorney's Office
712 South Stagecoach Trail
Hays County Government Center
San Marcos, Texas 78666
Telephone: 512-393-7600
Attorney for State

# TABLE OF CONTENTS

Identities of Parties and Counsel…………………………………………………..2

Table of Contents……………………………………………….………3

Index of Authorities…………………………………………………..4

Statement Regarding Oral Argument…………………………..…………..5

Preliminary Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ……....5

Appellant's Point of Error……………………………………………7

> The evidence presented at trail conclusively establishes a reasonable doubt that Appellant sent the purported threatening text messages to Shannon Pitcher; therefore, as a matter of law, the conviction must be reversed due to insufficiency of the evidence to support the conviction.

Statement of Pertinent Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ……...7

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .….…31

Conclusion and Relief Requested………………………………………..36

Certificate of Compliance…………………………………………….…..36

Certificate of Service……………………………………………………36

## Index of Authorities

TEX. R. APP. PRO. 38……………………………………………….....5

TEX. R. APP. PRO. 39.1…………………………………………………..5

Penal Code section 36.06(c)…………………………………………………………….5

TEX. R. APP. PRO. 44.2(a)……………………………………………............20

United States Constitution, 5th and 14th Amendments…………………………...32

**Cases**

*Jackson v. Virginia,* 443 U.S. 307 (1979)…………………………………………33, 34

*Johnson v. State,* 419 S.W.3d 665 (Tex.App.– Houston [1 Dist.], 2013). ………32

*Moff v. State*, 131 S.W.3d 485 (Tex. App. 2004)…………………...7, 31, 32, 35

*Thomas v. State,* 753 S.W.2d 688 (Tex.Crim.App.1988)…………………………7

Smith v. State 340 S.W.3d 41, 46-47 (Tex.App.–Houston [1 Dist.] 2011)………34

**TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:**

Comes now Christopher Quinn Rivera, hereinafter referred to as Appellant, via his Court appointed Counsel for this appeal, Rickey Jones, and submits this

Brief pursuant to the provisions of Rule 38 of the Texas Rules of Appellate Procedure, respectfully requesting that this Honorable Court reverse the jury's verdict and the sentence in this cause before this Court, and herein render judgment acquitting Appellant and dismissing the cause.

## Statement Regarding Oral Argument

Pursuant to Texas Rules of Appellate Procedure 39.1, Appellant requests oral argument and submits that it would materially aid the decisional process in this case.

## Preliminary Statement of the Case

Originally Appellant was indicted in No. CR-14-0448 for Retaliation, a third degree felony offense under Penal Code section 36.06(c). The indictment, as read to the jury, states:

> "On or about the 3rd day of March A.D. 2014, in Hays County, Texas, the defendant, Christopher Quinn Rivera did then and there intentionally or knowingly harm or threaten to harm another; to-wit: Shannon Pitcher by an unlawful act. To-wit: By threatening to hurt Shannon Pitcher in retaliation for or on account of the service or status of Shannon Pitcher as a witness or as a person who had reported the occurrence of a crime."[1]

As the Statement of Pertinent Facts will show, Appellant and Ms. Pitcher were in a romantic relationship with each other. Appellant visited Ms. Pitcher at her home on many occasions. During their relationship, Appellant found out that one of Ms. Pitcher's prior boyfriends had recently found her at a bar and beat her up in the parking lot. So they agree that Appellant would stay with her at her home for some time to provide protection for her in the event her ex-boyfriend came there to harm her. On the night at issue, Appellant had texted Ms. Pitcher several times and had

---

[1] R.R. Vol. 3:14:20-15:2

received no reply. Concerned that she may be in danger, he went straight to her house. When he arrived, he found that another man was in the house with Ms. Pitcher. She would not answer the door. She did not come forth with an explanation, and Appellant simply threw a fit and did some damage to the automobiles.

The Statement of Pertinent Facts will clearly show that nothing in the trial directly contradicted any of the following facts:

1) Appellant's phone was stolen after the night of the criminal mischief but before the purported threatening text messages were sent to Ms. Pitcher.

2) Ms. Pitcher understood and was competent with the same jargon that was always used in Appellant's text messages to her.

3) Ms. Pitcher had the know-how to send the purported text messages to herself with Appellant's phone number on the text as if the messages originated from Appellant's phone.

4) Or, Ms, Pitcher could have shared her know-how with Mr. Horde, the man who was in the house with her on the night of the incident, (and whose car Appellant had damaged) so that he could send her the text messages under Appellant's phone number.

5) Or, the one who stole the cell phone could have read the messages stored thereon and just jumped in to play the game.

6) The police released a phone to Appellant without checking it to validate what kind of cell phone it was or what messages it had been used to send.

At the close of the guilt/innocence phase of the trial, the jury returned its verdict finding Appellant guilty of Retaliation, as charged in the Indictment.[2]

<h2 style="text-align:center">Appellant's Point of Error</h2>

---

[2] R.R. Vol. 4:95:19-21

The evidence presented at trail conclusively establishes a reasonable doubt that Appellant sent the purported threatening text messages to Shannon Pitcher; therefore, as a matter of law, the conviction must be reversed due to insufficiency of the evidence to support the conviction.

## Statement of Pertinent Facts

An appellate court *must* consider *all* evidence actually admitted at trial in its sufficiency review *and give it whatever weight and probative value it could rationally convey to a jury.*[3] The Jury Trial on the guilt/innocence phase lasted only one day, February 3, 2015.  The question is:

> Given the evidence presented at trial, could a rational jury have found beyond a reasonable doubt that Mr. Rivera sent the two texts messages at issue?

## At trial, Appellate stipulated to the Criminal Mischief:

THE COURT: Ladies and Gentlemen: The Defense, as well as the State have come to an agreed stipulation. They stipulate that the defendant committed the offense of Criminal Mischief on February 26th, 2014. RR Vol 3:73:5-8

## Detective Nelson Wray testified:

Q. So from the Criminal Mischief that you were assigned, what did you determine was the actual Criminal Mischief?

A. Well, Criminal Mischief in this case was -- I guess, there was some damage on two vehicles: one was the victim's vehicle, one was another person that was at the

---

[3] *Moff v. State*, 131 S.W.3d 485, 488-489 (Tex. App. 2004) citing *Thomas v. State,* 753 S.W.2d 688, 695 (Tex.Crim.App.1988)

house's vehicle, it was a truck and Tahoe and they had some tires slashed and windows broken. RR Vol 3:48:17-23

**On direct examination by Appellant's trial attorney, Det. Wray, the investigation officer, testified:**

Q. Detective Wray, you're the investigating officer for this case, you're assigned to this case, the entire case, right?
A. Yes, sir. RR Vol 3:123:16-21

**Further, Det. Wray acknowledged that during the time period at issue in the Retaliation indictment, Appellant did not in any way harm Ms. Pitcher, or anyone, or anything:**

Q. Okay. So after March 3rd, Mr. Rivera **certainly did not assault Ms. Pitcher**, right?
A. Not to my knowledge.
Q. Okay**. He didn't hurt her** like he supposedly said in that text message.
A. Not to my knowledge.
Q. Didn't hurt anybody -- any of her friends or her property.
A. Not to my knowledge.
Q. Okay. So he had several months in which he could have done something, but he didn't, right?
A. I believe so.

**Moreover, Det. Wray acknowledged that he could have examined the phone that was released to Appellant; however, no one checked it out for any evidence related to the Retaliation charge.**

Q. Okay. Now, after he was arrested, did you go into his property or see what kind of cell phone he had?

A. The phone was released out of property.

Q. I see. And so you didn't have a chance to look at it before it was released?

A. No, sir.

Q. How soon after he was taken into custody was the phone released from property?

A. I'm not sure.

Q. Do you know who it was released to?

A. No, I'm not.

*Q. Okay. Wouldn't it have been a good idea to look at that phone before it was released from property? That would have been important evidence, right?*

*A. It could have been.*

*Q. In fact, you could have found incriminating texts on that phone, right?*

*A. Yes, I could have.*

*Q. Would have wrapped up the case, right?*

*A. It could have.*

*Q. But you let the phone go.*

*A. (Witness nods.)* RR Vol 3:125:8-126:16 Emphasis added.

**The Text Messages**

**Regarding the two text messages at issue, Det. Wray testified:**

Q. Now, in regards to the text messages that you believed were threatening, what date -- was that March 3rd, 2014?

A. I have to go back and look at exactly the date and time. The date was the same day and it was 1141 hours, which was a short time after I sent my e-mails to the streamliner or the e-mail I believed to be Rivera's.

Q. Okay. So am I correct that you said earlier that you sent an e-mail at 11:39 a.m.?

A. Yes.

Q. And what was the date and time of the text message that you believed was threatening?

A. Same day at 11:41. RR Vol 3:53:22-54:7

**The text messages were sent to him via email, and Det. Wray testified:**

Q. These -- let's start with the text messages. Ms. Pitcher e-mailed them to you?

A. Yes, sir.

Q. Okay. And did you have to use any kind of a – did they go to your computer or to your smartphone?

A. It went to my computer e-mail. RR Vol 3:54:20-25

**Again, under cross-examination, Det. Wray testified:**

Q. All right. So, in other words, these e-mails – what went into the e-mail could have been tampered with, right?

A. I guess they could have.

Q. **In other words, she could have added or deleted words or sentences, correct?**

A. **She could have**. RR Vol 3:57:6-11

**At the bench, the State concedes that its case turns on the text messages:**

MR. COUCH: The only images I'm gonna have are going to be the text messages, at this point.

MR. BOVIK: Well, **that's the center piece of your case.**

MR. COUCH: **Yeah**. RR Vol 3:72:21-25

**On voire dire, regarding the text messages that she emailed to Det. Wray and which constitute the State's case, Ms. Pitcher admitted that she had to opportunity to alter them, but denied doing so:**

Q. Okay. So between the exporting the text messages into the Notepad and the Notepad going to Detective Wray, you had an opportunity to alter them, didn't you?

A. Yes.

Q. Okay. Which ones did you alter?

A. Those that you have in your hand are the screen shots, those were not the texts -

Q. Okay --

A. -- those cannot be altered.

Q. -- but the --

A. I did not alter any e-mail.

Q. But you had the opportunity to do so, didn't you?

A. Yes.

Q. You were pretty mad at Mr. Rivera, weren't you?

A. I was scared.

Q. And you were angry.

A. I was more scared than angry. RR Vol 3:81:22-82:13

## The Text Message Authentication Issue

MR. BOVIK: Your Honor, there's nothing in those messages which indicates who it's from.

THE COURT: Okay.

Response from the State?

MR. COUCH: The phone number is right up there that everybody has testified that was linked to this defendant, it's the one that she had communicated with him. RR Vol 3:83:6-12

## Hence the Court's concern and reliance upon the *Tienda* case:

THE COURT: The Court is reviewing State's Exhibit 1-A through 1-R, pursuant to the authority set forth in *Tienda versus State*.

MR. BOVIK: Your Honor, there's nothing in those messages which indicates who it's from.

THE COURT: Okay. Response from the State?

MR. COUCH: The phone number is right up there that everybody has testified that was linked to this defendant, it's the one that she had communicated with him. She recognized his voice on it, she always knows that that was him. I think that his name shows up in there some as Chris -- Chris and Shannon. We've had at least two witnesses, three, that have given the same number. And there's also a reference to what I believe is the Criminal Mischief, Your Honor, that's on there that should -

THE COURT: As well as the location of The Warehouse.

MR. COUCH: It does say, "Warehouse." Yeah, right.

THE COURT: Your objection to State's Exhibit 1-A through 1-R is hearsay and --

MR. BOVIK: Improper foundation. They haven't established nexus, and also chain of custody. If you want to give the State more opportunity to lay their foundation, I have no problem with that.

MR. COUCH: I think it's there. She said that those are ones that she made herself, those are the ones that -- they're fair and accurate, those are the ones that she sent, the screen shots. They were not altered, they were not in this other program.

MR. BOVIK: I understand she sent them.

THE COURT: Here we go. The objections are overruled. **Part of the Court's analysis is based on *Tienda versus State*, which requires there to be a connection between what happened between these two individuals and the texts. I'm telling you, for the record, that I don't find that here.** I would prefer that you asked additional questions and then reoffer these matters as far as the specificity. But as it sits now, the objections from the Defense are overruled.

MR. COUCH: Okay. But I still need to ask questions?

THE COURT: I would prefer that you handle it that way.

MR. COUCH: Okay. I think I'm missing -- if the objections are overruled, which part is it that I'm trying to affirm up?

MR. BOVIK: He's trying to avoid -- he wants you to do a little more work, that's all, just to firm it up.

MR. COUCH: All right.

THE COURT: His objection was nexus. That objection is overruled, as well as the hearsay objection, as well as the foundation objections. If you're offering them at this point, then State's Exhibit 1-A through 1-R are, in fact, admitted. RR Vol 3:83:2 -85:8

The State's key evidence clearly shows that the text messages were written in a jargon that Ms. Pitcher understood:

Q. All right. So it goes here, (indicating): "Since you chose not to answer or comment. And you involved the cops and I got some bitch-ass detective calling me." What does **"LMFAO"** stand for?

A. "Laughing my fucking ass off."

Q. Okay. All right. So if we go up, that was on March 3rd, right?

A. Yes.

Q. Okay. So on March 3rd 11:41 a.m. there's another one that says: "Yo, Bitch, so let me get this straight. Your ex can fucking break all your shit and steal from you, no cops.

Your friend's dude can break into your vehicle, no cops. Punk bitch you had there are both not safe. Expect more visits from me. You will hurt." Did you take that as a threat?

A. Yes.

Q. And then 11:45 it talks about being contacted by the detective.

A. Yes.

Q. So at that point you had already reported this, correct?

A. Yes.

Q. Okay. So that message from Exhibit 1-O carries over onto the top of State's Exhibit 1-P. We still have a couple left, but this is the one that we saw -- this is the message that we referred to in 1-O about the detective contacting the defendant, right, (indicating)?

A. Yes.

Q. Okay. So that says: "I'm not a bitch like your ex. I can get the job done and now you're gonna find out the kind of pain that I bring. And you will not be ready, will be caught off guard." All right. And then after that at 11:50: "Most important, you will lose. **IDGAF."** What is that?

A. I think that's, "I don't give a fuck." RR Vol 3:103:7-105:15

**The Romance between Appellant and Ms. Pitcher**

**Det. Wray testified:**

Q. Okay. Did you -- from the conversations with her, did you get an understanding with what type of relationship Ms. Pitcher and Mr. Rivera had?

A. To an extent. I mean, there's certain questions I just didn't -- it was a -- I guess it was a boyfriend/girlfriend or relationship as a friend that was possibly intimate. RR Vol 3:49:10-16

**Ms. Pitcher testified:**

Q. Okay. So at some point was this sort of a romantic relationship?

A. Yes.

Q. Okay. So this time when the relationship became romantic, when did it stop being a romantic relationship?

A. It was a romantic relationship, but we were never in a committed relationship. RR Vol 3:61:2-8

**Ms. Pitcher acknowledged that she received, among many other texts, the following text from Appellant:**

> "You not only hurt me, you broke my heart and it was all yours."
> RR Vol 3:94:13-14

**Ms. Pitcher was asked about a specific text from Appellant:**

A. "And, for the record, you really broke my heart, Shannon. I obviously wanted you a whole lot more than you wanted me. That's a damn shame. I bragged so much about you and."

Q. Okay. What does that mean to you?

A. That he's trying to make me feel bad.

Q. Okay. Do you think it's true that you broke his heart?

A. Probably.

Q. Okay. Do you think he might have been angry when he was sending these texts about having his heart broken?

A. Yes.

A. Yes.

Q. Do you think that's what was behind a lot of these texts?

A. The threats?

Q. Well --

A. Yeah, I would say --

Q. -- possible threats?

A. -- possibly he's angry.

Q. Yeah. So he's threatening you because he's angry, right, because you broke his heart, right?

A. He's threatening me because I'm not doing what he wanted to do, is what I felt.

Q. Okay. And these threats continued and these angry diatribes continued all the way up through the 3rd of March, right?

A. Yes.

Q. **Because you broke his heart?**

A. **Yes**. RR Vol 3:129:5-130:8

**On direct examination, Mr. Rivera testified as follows:**

Q. And did the relationship develop into a romantic-type relationship?

A. Yes.

Q. Okay. And were you seeing her on a frequent basis?

A. It was pretty frequent. RR Vol 3:134:4-8

…………….

Q. Okay. All right. So during that time, were you aware if she was seeing anybody else?

A. I had my feelings. I had some inklings about it but we had an agreement, it was pretty much -- it was nothing serious between us.

Q. Okay. And were you seeing other people yourself?

A. Yes.

Q. Okay. Were you more serious about your relationship with Shannon Pitcher than she was towards you?

A. Towards the end, I could say I was. Because we had had a talk and she was had mentioned to me about us, kind of, phasing everybody else out and us taking our relationship to the next level. And I told her not to say things like that unless she was -- unless she really meant it. RR Vol 3:134:20-135:9

**Regarding his concern to protect Ms. Pitcher, Appellant testified:**

Q. Okay. So you texted Ms. Pitcher on -- very early in the morning on the 26th, right?

A. Yes.

Q. Where were you when you texted her?

A. I was at The Warehouse. We had discussed me staying with her for a week because her ex-boyfriend had attacked her at that same bar that previous Saturday, which was the whole reason for my mother taking me up there that Sunday.

Q. Okay. Let's back up a little bit.

Okay. So it's the 26th. So your mom took you to Ms. Pitcher's residence the previous Sunday?

A. Yes.

Q. Was that -- was that the 22nd or the 23rd?

A. I guess the -- Okay. Saturday night, she called me when the bar closed that night because it happened in the parking lot, her ex attacking.

Q. Was that Saturday the 22nd?

A. Sunday morning, the 23rd, at that time.

Q. Okay.

A. Yes.

Q. So he attacked her in the parking lot of The Warehouse bar?

A. Yes.  RR Vol 3:136:14-137:11

………………

Q. (MR. BOVIK) All right. So when your mom drove you to her house, what was that -- why did she do that?

A. Because, once again, my vehicle had broken down. I couldn't find a way to get to her. I felt that I needed to be there for her because it had happened and I wanted to be there to protect her.

Q. Okay.

A. So my mother was the only one that would bring me to her house.

RR Vol 3:137:22-138:5

………………

Q. (MR. BOVIK) Okay. Now, when you arrived at her place very early in the morning on the 26th, did you recognize the other vehicle in the driveway, the Ranger, Ford Ranger?

A. No.

Q. Okay. So you had no idea whose vehicle that was?

A. None whatsoever.

Q. Okay. But you had been sending her texts and she hadn't been responding, right?

A. Yes, which was cause for my concern because we had discussed me staying with her for a week in case her ex showed up after this incident.

Q. Did you know what kind of vehicle her ex drove?

A. He drove a maroon car. RR Vol 3:138:22-139:9

**Regarding the night of the criminal mischief, Appellant testified:**

Q. All right. So you saw the Ford Ranger in the driveway. And what went through your mind at that point?

A. I was furious because I was just, like -- I just wanted an explanation. I wasn't trying to get into her house, as she says. I wasn't trying to break into her house at all.

Q. You just wanted her to talk to you and tell you --

A. All I wanted was an explanation and I would have left.

Q. Okay. So if she had picked up the phone and called you or if she had come to the door and said this or that --

A. Yes, I could have handed it as a civil discussion like grown adults. And it shouldn't have gotten as out of hand as it did.

Q. Okay.

A. But with her ignoring me, it just in flamed the whole situation.

Q. Okay. So you did some damage to the truck and to her Tahoe?

A. Yes, I did.

Q. All right. And then what happened? What did you do then?

A. Then I left. RR Vol 3:140:12 -141:8

………………

Q. Okay. All right. Had you ever done anything like that before to --

A. No, I was just overwhelmed with emotion at that time.

Q. All right. Okay.

A. Like I said, I didn't know how to handle it --

Q. All right.

A. -- and that's why I left just like that --

Q. Okay.

A. -- after that.

Q. So you didn't expect a -- you didn't expect all of this to happen as a consequence, did you?

A. No, sir. I think this whole thing just got completely blown way out of proportion. RR Vol 3:145:10-22

**Appellant testified that his phone was stolen:**

Okay. So did you receive Detective Wray's e-mail?

A. Not when he sent it. I didn't actually get it until the middle of the month because my phone had been stolen on the 1st -- somewhere on the 1st of March and I had to get another one.

Q. Okay.

A. So whoever ended up with my phone ended up with everything that was in there.

Q. So these messages -- did you send all these text messages?

A. The ones from the night in February, yes, I did.

Q. Did you send messages on March 1st?

A. Not that I recall.

Q. Did you send messages on March 3rd?

A. Not that I recall.

Q. Okay. How do you explain these screen shots then?

A. The app I was using, which is the textPlus app that you brought up earlier, that is an app that works through Wi-Fi. It runs through your e-mail, which is my e-mail address. Anyone that knows my e-mail address and my password can put that app on their phone and it assigns that exact same number to their phone and it only -- it runs through Wi-Fi. Because I did not have a phone plan at that time and the only way I could send text messages was if I was around Wi-Fi.

MR. BOVIK: Okay. May I approach the witness, Your Honor?

THE COURT: You may.

Q. (MR. BOVIK) I'm showing you Defense Exhibit No. 1. Can you tell me -- without saying what it is, can you tell me what it is? I mean, without saying what it says will you tell me what it is?

A. That is the app that I use for my phone.

Q. Where -- this is a print off from what?

A. It's a print off from the Internet.

Q. The Web page for that company?

A. Yeah, the Web page for that company, textPlus, yes. RRs Vol 3:146:16-148:2
................
Q. (MR. BOVIK) Mr. Rivera, were you using an app called textPlus on your phone?

A. Yes, sir, I was.

Q. What does it do?

A. It allows me to make free phone calls, purchase minutes for phone calls and send text messages via Wi-Fi.

Q. Over the Internet?

A. For free, yes.

Q. Rather than going through --

A. So I didn't have a phone bill. RR Vol 3:149:19-150:3

…………………….

**Q. All right. So you're saying that you didn't send these screen shot text messages, or whatever they are, on March 3rd and March 1st. If you didn't, then who did?**

**A. I honestly couldn't tell you that, sir.**

**Q. As of March 1st, did you still have your -- you still had a phone then, right?**

**A. I had a different one, it wasn't an Android.**

**Q. It wasn't an Android?**

**A. No.**

Q. What was it?

A. It was just your basic run-of-the-mill cell phone, like those government cell phones that they give out.

Q. You mean those little primitive things?

A. Yes. The Obama phones.

Q. Okay. Was it something primitive like this, (indicating)?

A. Yes.

Q. Okay. I'm still in the dark ages?

A. Yeah, so was I.

Q. So that phone -- would something like that have been capable of sending these sorts of messages?

A. Not from that number, no.

Q. All right. Do you have any idea what happened to your Android phone?

A. I have no idea. It was taken from my truck and it was, like, a day later before I even realized it was gone. I was just assuming it was in my truck. I went looking for it and it was gone, and that's when I came to the conclusion that it had been stolen.

Q. Okay. If someone else had sent these text messages, would they have needed your phone to do it?

A. Well, not necessarily.

Q. They could have sent it from any other phone or computer, right?

A. As long as you had my e-mail address and my password, yes, the same number would have popped up.

Q. Okay. So the same person could have been in China or Costa Rica and sent those messages and your phone number would have popped up.

A. Exactly. RR Vol 3:151:17-153:6

## State's Cross Examination of Appellant:

A. Well, once I just got done airing everything out and I didn't get any feedback from her, you know, I was, like, "Well, that's that."

Q. Okay.

A. I brushed it off and moved on --

Q. Well, some of these messages --

A. -- and never looked back.

Q. I mean, when you called her -- basically, you called her a whore --

A. Yes.

Q. -- in one of these, correct?

A. Uh-huh. On numerous times.

Q. Okay. You're trying to get a reaction, right?

A. I was just -- you know, I was upset. And, yes, basically, I was just trying to get a reaction out of her. I was just saying things, you know, just trying to get some kind of reaction, which I never got, so I just basically just cut it out and went on about my business and just never contacted her anymore after that.

Q. All right. When you said -- you referred to her as just another "Sorry, lying-ass bitch

A. Uh-huh.

Q. -- that was at 4:09 in the morning. What was that one about?

A. Because that's -- I was just merely stating my opinion about her at that time.

Q. Okay. But that wasn't the last one you --

A. After what I found out --

Q. -- had sent.

Q. (MR. COUCH) That was not the last text message you sent, right?

A. May not have been. If there's more, there's more from that day. I know I sent a lot of them. I know I sent a lot of them because I was just going off and just going off and I got it all out. Once it was all out, I felt better --

Q. Okay.

A. -- and I left it alone.

Q. Well, did it -- so did it take you six days and I don't know how many pages -- several pages of text messages to get it all out?

A. Well, like I said on the 1st, the phone I was sending those text message from, I couldn't find it anymore, so I'm assuming it was stolen. And so that's -- you know, whoever else got my phone probably read everything I sent and just went ahead and had a field day with it, obviously.

Q. Where did you lose your phone do you think? Where was it taken? When is the last time -- when did you notice that it was gone?

A. A friend -- a female friend of mine went to some of her friends' houses and -- the night before, and when I got back in my truck the next morning to use my phone and to go home, it was gone.

Q. What day was that?

A. I think it was on a Friday, if I'm not mistaken. Thursday or Friday.

24

Q. Well, what was the –

A. I'm not sure. It was --

Q. Okay.

A. -- last year. I mean, I don't have a calendar in my head. And then I come to find out later on down the line that that girl had been stealing a lot of things from me --

Q. Okay. So on Friday --

A. -- so I didn't --

THE REPORTER: Hold on. Please, one at a time.

Q. (MR. COUCH) Just answer the question.

THE COURT: Do not talk over one another. Next question.

THE WITNESS: Sorry.

**Q. (MR. COUCH) So March 1st would have been a Saturday. Do you think that was when your phone was taken?**

**A. Yes, roughly.**

Q. Okay. So you would have had your phone the previous test messages --

A. Yes.

Q. -- right?

A. Yes.

Q. Okay. So this text --

MR. COUCH: May I approach, Your Honor, again?

THE COURT: You may.

Q. (MR. COUCH) Let me show you State's Exhibit I-J. I don't know that there's a particular date on here, but what I'm showing -- these should all be in order. So that should be the last -- according to you, March 1st, 2014, which is a Saturday, that should be the last text -- you're saying you didn't send the text from March 1st -- then State's Exhibit 1, that's not your text, correct?

A. No, I lost mine in the morning, that's at night.

Q. Okay. So the one that says: "Hope you're ready for the show tonight, it's gonna be a crowd pleaser, it's gonna be a performance to die for," you did not send that?

A. No. That's at 11:30 at night, I --

Q. -- so you lost your phone earlier than that, correct?

A. Yes, sir.

Q. So anything before that -- basically, anything before 1-N is gonna be something that you sent.

A. Yes.

Q. So you're saying here, you know: "I wanted his ass, not his truck," is something you would have sent?

A. Yes.

Q. Okay. So you called her a shady-ass bitch?

A. Yes.

Q. Okay. And then here's one from 1-O that looks like 11:41 or so, and it says, "Yo, bitch," and that's the one -- that one you didn't send, because that was March 3rd, correct, according to you?

A. Exactly.

Q. Okay. All right. And then on 11:45 on State's Exhibit 1-O says: "Punk bitch you had there" -- I guess these, kind of, go together: "Punk bitch you had there, both not safe. Expect more visits from me. You will hurt." So according to you, that you did not send, right?

A. No.

Q. Okay.

A. I wouldn't waste my gas like that.

Q. Okay. This is another one on 1-P is another one you would not send, because according to you, you lost your phone.

A. Yes.

Q. "I'm not a bitch like your ex. I get the job done and now you're gonna find out the kind of pain that I bring. You will not be ready, will be caught off guard." That, you didn't send?

A. Yes.

Q. Okay. And you talk about being threatened before, but that's not something you sent, right?

A. Huh-uh.

Q. Okay. All right. And here's a text, according you, from someone else that called her a whore also, right?

A. Yes.

**Q. Okay. What I'm getting at, Mr. Rivera, is it looks like the language is pretty consistent across the board from the text message that you sent and the ones you say you didn't send when your phone, you say, was lost.**

A. Uh-huh.

Q. Okay. So you think that the person who stole it just basically had the same kind of language?

A. It doesn't necessarily have to be the person that stole it, it could have been anybody that had my e-mail address --

Q. Okay.

**A. -- and my password and put that number on their phone. It could have been her, it could have been the guy she had with her. You know what I mean? She knows how I talk.**

Q. Who was the guy she had with her?

A. Apparently, Mr. Horde. I never met the guy.

Q. Well, did he have -- well, if you never met him, how would he have had your password?

**A. She had it.**

27

Q. Okay. So you think she gave it to him and he was sending her text messages from your -- why would she do something like that?

**A. What I'm getting at is they could have used his phone to download the app to put in my e-mail address with my password, which would have been my number. They could have just sat there thinking up all kinds of stuff and just sending them to her phone --**

Q. Okay.

A. -- from his phone, which would have been coming from my number.

Q. Okay. And that's what you think happened?

A. It's either that or whoever stole my phone. I can't exactly tell you what happened because --

**Q. Or it could be that you sent the text, correct?**

**A. No.** RR Vol 3:158:19-165:11

**……………………..**
Q. Okay. So the person that was sending these text messages after March 1st or after you lost your phone or it was stolen or whatever --

A. Uh-huh.

Q. -- would have had to have that app and your e-mail address and your password, right?

A. Yes.

Q. Okay. So you're saying that possibly somehow Shannon or James Horde got your phone?

A. I know Shannon had my password to my e-mail address or it could have been whoever took my phone, either/or --

Q. Okay.

A. -- I honestly can't tell you who --

Q. Well, but what I'm asking is --

A. -- or for what reason, what their motives were behind it.

Q. Okay. But to send a text message, you would have had to have your phone, right?

A. No.

Q. Okay. That's the question I was trying to ask.

A. No, I could put that number on your phone right now.

Q. Okay.

A. If you have an Android phone, I could put it on anybody's phone right now and send a message to whoever and my number will pop up. RR Vol 3:166:9-167:8

………………………

Q. When did you get the new phone?

A. In mid-March, because I was using my sister's phone from there, before that. RR Vol 3:172:21-23

………………………

Q. When did you start using her phone?

A. Couple of days after.

Q. Okay. Couple of days after what?

A. Couple days after my phone was stolen. Actually, later on.

Q. Later on --

A. Later on, probably that weekend. Later on that weekend when my phone was stolen.

Q. Okay. So you --

A. She had pretty much the same kind I did.

**Q. Okay. So were you saying that the phone was stolen March 1st, right?**

**A. Yes.**

Q. Okay. So March 2nd, March 3rd, when did you start using her phone?

A. Yeah. It was probably that same day or the next day. Because I would log her out and I'd log me in and upload stuff and then log back out, because it was her phone, it wasn't mine, I couldn't carry it around with me. RR Vol 3:173:13-174:6

………………

Q. All right. So the only Internet access you had was from March 1st or from March 1st to the time you got your new phone, which was mid-March, right?

A. Uh-huh.

Q. Okay. So the only time you had Internet access was with your sister's phone?

A. Yes. RR Vol 3:176:12-18

……………………..

Q. Okay. But at least in theory if you would have had your e-mail account and your password, like you testified before, you could send text messages and it looks like your old number to Shannon Pitcher if you wanted to, correct?

A. If I had the app downloaded. But on her – my sister's phone it wasn't.

RR Vol 3:177:5-10

## Argument and Authorities

Texas law holds:

> "If a defendant challenges the legal sufficiency of the evidence to support
> his conviction on direct appeal, the appellate court always has a duty to
> address that issue, regardless of whether it was raised in the trial court. A
> defendant need not file a motion for directed verdict or a motion for new
> trial to preserve an appellate claim concerning the sufficiency of the
> evidence to prove his guilt. He need not object to the admission of evidence
> in the trial court to preserve this issue. He need not claim, in the trial court,
> that the method by which the State proved an element of the offense was
> deficient or defective. In short, a claim regarding sufficiency of the

evidence need not be preserved for appellate review at the trial level, and it is not forfeited by the failure to do so."[4]

Hence, the present issue is properly before the Court.

Regarding the sufficiency of the evidence for Appellant's conviction for Retaliation, the question before the Court is: Did the evidence presented at trail conclusively establish a reasonable doubt that Appellant sent the purported threatening text messages to Shannon Pitcher?

The role of Appellate Courts is that of "a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt."[5] The Johnson Court went on to hold: "However, our duty requires us to 'ensure that the evidence presented actually supports a conclusion that the defendant committed' the criminal offense of which he is accused."[6]

The Appellate Court's role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt.[7] The Johnson Court explicitly held: "However, our duty requires us to "ensure that the evidence presented actually supports a

---

[4] Moff v. State, 131 S.W.3d 485, 488-489 (Tex. App. 2004)

[5] *Johnson v. State,* 419 S.W.3d 665, 670-671 (Tex.App.– Houston [1 Dist.], 2013). Citing *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988).

[6] Id., citing: *Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App.2007)

[7] *Johnson v. State* 419 S.W.3d 665, 670-671 (Tex.App. Houston [1 Dist.] 2013). *Citing Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988).

conclusion that the defendant committed" the criminal offense of which he is accused."[8] Appellate Courts review sufficiency challenges using the legal-sufficiency standard of review announced by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).[9] An appellate court determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence viewed in the light most favorable to the verdict.[10] Courts measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case.[11] Under this standard, evidence is insufficient to support a conviction if considering all record evidence in the light most favorable to the verdict, a factfinder could not have rationally found that each essential element of the charged offense was proven beyond a reasonable doubt.[12]

---

[8] Id. *Citing Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App.2007)

[9] *Brooks v. State,* 323 S.W.3d 893, 912 (Tex. Crim. App. 2010)

[10] Clayton v. State, 235 S.W.3d 772, 778 (Tex.Crim.App.2007) (quoting Hooper v. State, 214 S.W.3d 9, 16–17 (Tex.Crim.App.2007))

[11] *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

[12] Smith v. State 340 S.W.3d 41, 46-47 (Tex.App.–Houston [1 Dist.] 2011) citing: Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); In re Winship, 397 U.S. 358, 361, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368 (1970); Brooks, 323 S.W.3d at 899 (plurality op.); Laster v. State, 275 S.W.3d 512, 517 (Tex.Crim.App.2009); Williams v. State, 235 S.W.3d 742, 750 (Tex.Crim.App.2007).

Evidence is insufficient under the *Jackson* standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt on an element of the offense; or (4) the acts alleged do not constitute the criminal offense charged.[13]

In the present matter, Jackson factor number 3 applies, namely: the evidence conclusively establishes a reasonable doubt on an element of the offense. Specifically, the evidence establishes a reasonable doubt that Appellant sent the text messages at issue in the Retaliation charge. The uncontradicted evidence establishes that Appellant cell phone had been purloined. Moreover, the evidence shows that the secondary phone he put into use after his phone was purloined did not have the capability of sending the text messages under his earlier cell phone number. Moreover, the evidence shows that Ms. Pitcher had the know-how to send text messages under Appellant's phone number even without having personal possession of Appellant's stolen phone. As Texas law clearly noted in Butler v. State, PD-0456-14 Court of Criminal Appeals of Texas April 22, 2015:

> Mindful that "cell phones can be purloined[, ]" we observed in *Tienda* that, the fact "that a text message emanates from a cell phone number assigned

---

[13] Id. at 47 citing *Jackson*, 443 U.S. at 314, 318 n. 11. And Laster, 275 S.W.3d at 518; Williams, 235 S.W.3d at 750.

to the purported author . . . without more," might be "[in]sufficient to support a finding of authenticity." 358 S.W.3d at 641-42.

An appellate court *must* consider *all* evidence actually admitted at trial in its sufficiency review *and give it whatever weight and probative value it could rationally convey to a jury.*[14] The sum of the evidence presented by both sides at trial has sufficient weight and probative value to confirm Appellant's defense.

Finally, whenever an appellate court finds the evidence insufficient under this standard, it must reverse the judgment and enter an order of acquittal.[15] The Supreme Court in *Burks v. United States* held that because the "Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient, the only 'just' remedy available for a court finding legal insufficiency is a judgment of acquittal." *Burks v. United States*, 437 U.S. 1, 18 (1978).

Under current Texas law, because the evidence presented at trial conclusively establishes a reasonable doubt that Appellant sent the purported threatening text messages to Shannon Pitcher ─ the evidence is legally insufficient to support his conviction.

### Conclusion and Relief Requested

Appellant has shown that the evidence adduced at trial was insufficient to support a finding of guilt beyond a reasonable doubt. Therefore, the conviction and sentence herein should be reversed and a judgment of acquittal entered.

[14] *Moff v. State*, 131 S.W.3d 485, 488-489 (Tex. App. 2004) citing *Thomas v. State,* 753 S.W.2d 688, 695 (Tex.Crim.App.1988)

Respectfully submitted,

[15] Id at 47, citing Tibbs v. Florida, 457 U.S. 31, 41, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652 (1982).

_Rickey D. Jones_

_____

Rickey Jones
State Bar No. 00787791
1910 Pacific Ave, Ste 15100
Dallas, Texas 75201
214 742-0708
214 742-5956 facsimile
ATTORNEY FOR APPELLANT

CERTIFICATE OF COMPLIANCE

This is to certify that in accordance with Texas Rule of Appellate Procedure 9.4 (i)(3), the brief consists of approximately 7591 words.

**Certificate of Service**

This is to certify that on July 2, 2015, a true and correct copy of the above and foregoing document was served on the District Attorney's Office, Hays County by facsimile transmission.

_Rickey D. Jones_

_____

Rickey Jones