# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00699-CR

---

**Emanuel Matthew Williams, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY
### NO. C-18-0932-SB, THE HONORABLE JAY K. WEATHERBY, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Emanuel Matthew Williams, Jr., was charged with continuous sexual abuse of a child. *See* Tex. Penal Code § 21.02. The alleged victim in the case was K.R., who was the daughter of Williams's next-door neighbor.[1] At the end of the guilt-innocence phase, the jury found Williams guilty of the charged offense. Following a punishment hearing, the jury recommended that he be sentenced to twenty-five years' imprisonment. *See id.* § 12.32, 21.02(h). The trial court rendered its judgment of conviction consistent with the jury's verdict. In three issues on appeal, Williams asserts that the evidence was insufficient to support his conviction and that the trial court erred by admitting evidence concerning extraneous offenses and by excluding K.R.'s medical records from after the alleged abuse. We will affirm the trial court's judgment of conviction.

---

[1] Because K.R. was a minor when the alleged offense occurred, we will refer to her by using a pseudonym and refer to her family members by pseudonyms or their relationships to her. *See* Tex. R. App. P. 9.10 (defining sensitive information).

# BACKGROUND

Mother lived in a house in San Angelo, Texas, with her three children: daughter K.R., born in September 2002 and the oldest; daughter L.R., the middle child; and son J.R., the youngest.[2] Williams and his long-term girlfriend Salma Batshon moved into the house next door at the end of 2013. At that time, K.R. was eleven, L.R. was four, and J.R. was nearly two. Williams and Batshon lived in the home with their young son K.W.[3] During the time in question, Mother had several jobs, including one that required her to work overnight. Mother was also on community supervision for a prior conviction. To comply with the terms of her community supervision, she used K.R.'s urine to pass the required drug tests. Due to her work schedule, Mother sometimes needed someone to babysit her children. She initially relied on her cousin ("Cousin") and his wife ("Cousin's wife"), who babysat her children for several months.

After Mother befriended Batshon, Mother asked Batshon if she could watch her children when Mother had to leave home for work or to run errands. Mother offered to pay Batshon in cash or supply Batshon with marijuana. Batshon agreed, and Mother regularly asked K.R. to deliver the marijuana payments to Batshon. Batshon would babysit the children at her home, which had two bedrooms. The first bedroom was K.W.'s bedroom, and the second one had been converted to a music studio for Williams. Batshon and Williams would either sleep in the living room or in the studio. When Batshon had to leave the home while the children were there to run errands or donate plasma, Williams would watch the children. The babysitting arrangement lasted for at least several months. During one of the last times Batshon and

---

[2] Mother later had two additional children.

[3] Williams and Batshon had five other sons and one daughter, but those children did not live with the couple. Williams had eleven other children with other women, but none of them lived with the couple either.

Williams watched the children, Mother fell asleep in her house after leaving food cooking on the stove, causing a fire. After noticing smoke coming from the house, Williams went into Mother's house and carried her to safety.

At some point there was a falling out between Mother and Williams and Batshon that resulted in multiple reports being made to the Department of Family and Protective Services ("Department") concerning both households and resulted in the police being called for multiple reasons, including noise complaints and a report concerning an altercation involving Williams and someone Mother used to date. Cousin's Wife also called the Department to report an incident in which Mother shot L.R. with a BB gun. Around this time, K.R. went to live with her maternal Grandmother and Step-grandfather.

In October 2016 when K.R. was fourteen, she told Grandmother that Williams touched her inappropriately when she lived next to him at Mother's home. K.R. told Grandmother that the abuse happened when she was twelve and thirteen. After hearing the disclosure, Grandmother called her brother, who was a police officer. Shortly thereafter, Mother learned of the abuse and drove Grandmother and K.R. to the police station. A police officer interviewed K.R. about the claims and prepared a report, and K.R. was later taken to have a forensic exam. L.R. and J.R. were both interviewed at a children's advocacy center, and L.R. reported being sexually abused by someone. At the time of the interviews, L.R. was seven, and J.R. was five. L.R. was unable to clearly identify the offender, but the follow-up investigation revealed that L.R. was describing someone other than Williams.

The police questioned Williams about K.R.'s allegations, and he told the police officers that Batshon would babysit Mother's children and that he was present in the home while the children were asleep. He also stated that Mother and K.R. had falsely accused him of the

3

abuse due to prior disagreements. Batshon told the police that Mother's children would spend the night at her house. Following an investigation, Williams was arrested and charged with continuous sexual abuse of a child.

During the trial, the State called the following witnesses: Grandmother, Batshon, Mother, L.R., K.R., Williams's former stepdaughter ("Stepdaughter"), the police officer who interviewed K.R., the police officer who interviewed Williams, and an expert witness on the dynamics of outcries by children. Williams elected to testify and called or recalled the following witnesses: Mother, Grandmother's police officer brother, a witness coordinator for the prosecution, Step-grandfather, Cousin's Wife, an investigator for the prosecution, and Batshon. The witnesses testified regarding the events set out above and provided additional detail as discussed below.

The officer who interviewed K.R. explained that K.R. identified Williams as the person who abused her and described four incidents of abuse occurring one-and-a-half to two-and-a-half years before she made her outcry. The officer who interviewed Williams testified that Williams admitted that Batshon used to babysit K.R. and her siblings. The officer also related how K.R. discussed during her forensic exam Williams's attempt to penetrate her with his penis. The officer specified that the timeline he developed showed that the abuse occurred inside Williams's home from May 2015 to December 2015 and stated that his timeline was based on K.R.'s outcry and from his interviews with Batshon, Williams, Grandmother, and Mother. In particular, he noted that K.R. revealed that the abuse happened when she was twelve and thirteen.

Grandmother testified that K.R. and her siblings had lived with her at various times. Of significance to this case, Grandmother related that K.R. was living with her in October

2016 and that the other children moved in later. Further, Grandmother recalled that while K.R. was living with her, K.R. made an outcry concerning sexual abuse.

Next, Batshon testified that she babysat Mother's children daily during the summer and would watch them until Mother returned from work. Batshon related that Williams did not have steady employment and would be home when unemployed. She also stated that she would leave the children with Williams when she donated plasma twice a week. Although Batshon testified that she initially did not think any sexual abuse had occurred, she admitted that she changed her mind later and told the police that she thought Williams had sexually abused K.R. but not L.R. Moreover, Batshon discussed how Williams confessed to her that he placed his penis on the side of K.R.'s vagina without inserting it, but Batshon initially thought he was joking. Further, she related that Williams and K.R. would spend time alone in the studio.

Batshon recalled that she had a falling out with Mother "a little bit after [she] started babysitting" and did not talk to Mother for a year; Batshon stopped babysitting but did not remember when. Additionally, Batshon remembered that Mother called the Department and made a false report that Batshon's young son had not been fed and had been struck and that Mother called the police to make a noise complaint about Williams and her; however, Batshon admitted that she also had told the Department that Mother was neglecting her children. During her cross-examination, Batshon admitted that she started dating Williams's nephew after Williams was arrested in this case and that she had a child with Williams's nephew.

In her testimony, Mother explained that she changed jobs multiple times during the period in question, that Batshon watched her children when she worked different jobs or had to run an errand, and that the children would sometimes spend the night at Batshon's house. Additionally, Mother related that Cousin and his wife would also watch the children sometimes.

5

Mother denied ever making a report to the Department concerning Batshon or Williams but did remember that the police were called once because Williams and Mother's ex-boyfriend were screaming at each other and "almost fighting." When discussing the allegations made by K.R. against Williams, Mother stated that she believed K.R. because K.R. "was very detailed" and "adamant" and because she would have been able to tell if K.R. were lying.

Mother testified that after K.R. made her outcry, L.R. made her own outcry concerning Cousin. Although Mother agreed that L.R.'s allegations sounded similar to K.R.'s and that the abuse L.R. described allegedly occurred around the same time as the abuse committed by Williams against K.R., Mother believed that the abuse L.R. described could not have happened because L.R. was never alone with Cousin. Further, Mother recalled that L.R. recanted the allegations against Cousin. Moreover, Mother explained that after K.R. made her outcry, Mother showed the police report to her landlord and that her landlord agreed to let Mother move into another home the landlord owned without paying a full new deposit because of the situation.

In her testimony, L.R. testified that Batshon and Williams babysat her and her siblings and that Batshon would leave the children alone with Williams. Further, L.R. recalled that she was not allowed in the studio but that Williams took K.R. into the studio more than once when Batshon was either in another room or out of the house. Additionally, L.R. stated that K.R. would be in the studio with Williams for an hour, that she would hear K.R. telling Williams to "stop," that K.R.'s voice would sound muffled like her mouth had a pillow over it, and that she would hear grunting sounds emitting from the studio. When discussing what happened after K.R. would leave the studio, L.R. testified that K.R. would have tears in her eyes and would have

6

her head down. L.R. remembered that K.R. later disclosed to her what happened in the studio after K.R. made a report to the police.

During her cross-examination, L.R. explained that she told Mother that Cousin had touched her inappropriately but that Mother did not believe her. She also stated that she told the forensic interviewer that someone had touched her inappropriately and agreed both that she told the forensic interviewer that Williams was not the offender and that she described Cousin's home when discussing where the abuse occurred. On redirect, L.R. stated that she would not lie about Williams to protect Cousin or lie about allegations at Mother's or K.R.'s request. L.R. further clarified that Cousin never watched K.R. because K.R. was living with Grandmother when Cousin watched L.R. and J.R. Additionally, L.R. explained that there was no overlap during the periods in which Cousin and Williams babysat her.

Next, K.R. was called to the stand and testified that Batshon and Williams started watching her when she was eleven or twelve while Mother worked or needed to run an errand. While she was at Williams's house, Batshon would sometimes leave for hours to run errands or donate plasma. Further, K.R. related that, sometime after moving in with Grandmother, she disclosed to Grandmother that Williams had sexually abused her and that she had not told anyone sooner because she did not think anyone would believe her, because she did not know if there would be anyone else to watch her and her siblings, and because she did not trust Mother as much as she trusted Grandmother.

When describing the abuse at trial, K.R. provided general summaries of ongoing abuse and detailed four separate incidents of abuse. Regarding the general summaries, she said that Williams would rub his body against hers, place her in his lap, and put her hand on his penis. She remembered feeling his penis become erect. She also discussed how Williams would grab

7

her "boobs," put "his hand on [her] thigh," and touch her with his penis "[m]ultiple times a day" "any chance he got" when no one was around. She testified that the abuse went on for "close to a year." She remembered that Williams told her to keep the abuse a secret.

Concerning the specific incidents, K.R. testified that one night she woke up in the living room of Williams's home, noticed that her pants had been removed, and realized that Williams "was laying next to [her] and he was touching" her "privates and [her] boobs" with his hands; she clarified that Williams touched her vagina. Regarding the second incident, she said that she was sleeping in the studio and woke up when Williams inserted his finger into her vagina. The third incident also occurred in the studio. Williams put a blanket over the two of them, removed his pants, and inserted the tip of his penis into her vagina. She pushed him away, ran to the bathroom, and saw blood when she "went to pee." She related that when she told the forensic interviewer about this incident, she described the incident as an attempted rape because he could not fully insert his penis inside her. The fourth described incident occurred when she was on the couch. After Williams lay down behind her, he put his hands under her shirt, and she could feel his penis becoming erect behind her. K.R. stood up and walked away, ending the incident. K.R. emphasized that no one had asked her to lie about the allegations against Williams and that she was not involved in a conspiracy to cover for someone else's misconduct or to get revenge against Williams.

The State's final witness was Stepdaughter, who was Williams's former stepdaughter from a relationship he had with someone other than Batshon. In her testimony, Stepdaughter explained that Williams began physically abusing her in the late 1990s when she was seven and would hit her with a belt. She explained that Williams also physically abused her younger siblings. Next, she testified that he started touching her inappropriately when they were

8

alone after she turned nine. More specifically, she related that the abuse initially occurred when no one else was in their home or later, after Williams and her mother separated, in a hotel room or a house where Williams was living. When discussing the abuse, she stated that he would rub his penis on her "bottom" and that this occurred twice. Further, she testified that when she turned eleven Williams penetrated her "both vaginally and anally" on the same day. She told her mother when she was fifteen and again when she was seventeen, but she testified that her mother did not believe her and that no report was made to law enforcement. Stepdaughter recalled that Batshon reached out to her three years ago and told her that Williams had been arrested. Stepdaughter told Batshon about the abuse, and the police later contacted Stepdaughter to ask her about it.

In his testimony, Williams testified that he was fifty-four at the time of trial in 2024. He related that Batshon and he moved next to Mother in November or December 2013. After Batshon and Mother became friends, they started smoking marijuana together. Batshon began watching Mother's children at the beginning of 2014 and continued to watch them through November 2014. According to Williams, Batshon would bring the children to their house after he left for work, but he agreed that the children would be in the house when he came home from work and that he would be in the home with them when he had the day off; however, he explained that there were only a few times that he was ever alone with the children.

Further, Williams recalled that the two families had a falling out starting in 2014. First, he explained that K.R. sneaked into his house and threw cold water on him while he was in the shower. In addition, he testified that K.R. would throw baby powder around his home. Additionally, he testified that Mother called the Department near the end of 2014 to report that Batshon and he were smoking marijuana.

9

Although Williams explained that Batshon and he stopped talking to Mother for six months, he also related that the children still came to his house. Regarding one of those times, he explained that K.R. asked in June 2015 if she could spend the night at his house with one of her friends and that Batshon allowed it because Mother was high. Williams recalled that the fire at Mother's home occurred the next day and that he went into her home to save her.

Williams testified that when the children came to his house, they often had bruises on their bodies. Regarding one bruise, L.R. told him that Mother had slapped her and caused a black eye, and Williams called the Department to report the incident. He also called L.R.'s school after seeing another bruise on her eye. After learning that Mother shot L.R. with a BB gun, Batshon called Grandmother and asked her to take custody of the children. Williams also called Mother's community-supervision officer to report that she was faking her urine tests. Additionally, Williams testified that Mother called the Department and made reports about Batshon and him and called the police to report that they were playing music too loudly. Williams recalled that someone called the police after Mother's former boyfriend and he got into an argument. According to Williams, the police responded, did not arrest either man, and explained that an allegation had been made that Williams was beating Batshon and their child.

In his testimony, Williams related that the tension between the two families continued through 2016 and that K.R. made the sexual-abuse allegations against him in October 2016. Further, he testified that Mother's children were removed from her custody and that she later moved out of the house in December 2016. Williams described Mother as a manipulative person. Further, he testified that Batshon would prefer that he remain in jail so that she can continue dating his nephew, which she started doing shortly after he was arrested. Williams

testified that he believed Mother and Batshon had been talking to one another about what to say at trial. Similarly, Williams thought that Stepdaughter and Batshon had conspired to set him up.

Williams denied ever touching K.R. inappropriately or trying to have sex with her or any other child. Additionally, he related that K.R. told him that Mother's ex-boyfriend, whom he got into an argument with, was touching her but asked Williams not to say anything. Williams asserted that K.R. and Stepdaughter were both lying. Further, he emphasized that Cousin was the person who abused L.R. and opined that he was being blamed for what Cousin did.

Williams also called Cousin's Wife to the stand. In her testimony, she explained that Cousin and Mother were close. Further, Cousin's Wife explained that for several months in 2013, Cousin and she would babysit K.R., L.R., and J.R. when Mother had to work. Cousin's Wife testified that Mother would bring the children to her house and that Mother mentioned that her next-door neighbors would also babysit the children. Further, Cousin's Wife described having to call the Department to report that Mother's house was not safe. More specifically, Cousin's Wife said that Mother would hit her children with extension cords and wooden spoons. In addition, Cousin's Wife remembered that once when Mother and the children were at her house, Mother "got irritated" at L.R. for asking for something. Mother "pointed [a BB] gun at" L.R., and the gun went off. Finally, Cousin's Wife testified that Mother would use her children to manipulate other people into giving her what she wanted.

After considering the evidence presented at trial, the jury found Williams guilty of continuous sexual abuse and later sentenced him to twenty-five years' imprisonment.

Williams appeals the trial court's judgment of conviction.

11

**DISCUSSION**

In his first issue on appeal, Williams challenges the sufficiency of the evidence supporting his conviction. In his second issue, Williams asserts that the trial court erred by admitting evidence concerning the extraneous offenses involving Stepdaughter. Finally, Williams argues that the trial court erred by excluding medical records pertaining to K.R.'s mental health after the abuse ended.

## Sufficiency of the Evidence

When reviewing the sufficiency of the evidence, we view all the evidence in the light most favorable to the judgment to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). In making this determination, "[w]e view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann*, 602 S.W.3d at 577. "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id.* "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id.*, and are "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Appellate courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Id.* at 107 (quoting *Jackson*, 443 U.S. at 320). The uncorroborated testimony of the victim of a sexual offense who was a minor at the time of the offense can be sufficient to support a conviction. Tex. Code Crim. Proc. art. 38.07; *Johnson v. State*, 419 S.W.3d 665, 671 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (determining that child victim's testimony "is alone sufficient to support appellant's conviction for sexual assault of a child").

The continuous-sexual-abuse statute was enacted to address concerns that the governing statutes did not readily "accommodate the prosecution of generic, undifferentiated, ongoing acts of sexual abuse of children." *See Dixon v. State*, 201 S.W.3d 731, 737 (Tex. Crim. App. 2006) (Cochran, J., concurring). Under the Penal Code, a person commits the offense of continuous sexual abuse of a child if the following occurs:

(1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and

(2) at the time of the commission of each of the acts of sexual abuse, the actor is

13

17 years of age or older and the victim is:

> (A) a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense . . . .

Tex. Penal Code § 21.02(b). "[M]embers of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed" but "must agree unanimously that the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse." *Id.* § 21.02(d).

The term "act of sexual abuse" includes aggravated sexual assault, which occurs when an actor "causes the penetration of the anus or sexual organ of a child by any means." *See id.* §§ 21.02(c)(4), 22.021(a)(1)(B)(i), (a)(2)(B). The term also includes "indecency with a child . . . other than by touching, including touching through clothing, the breast a child." *Id.* § 21.02(c)(2). Indecency with a child means engaging in sexual contact with a child by touching the genitals of a child including through clothing or the "touching of any part of the body of a child, including through clothing, with . . . any part of the genitals of a person" "with the intent to arouse or gratify the sexual desire of any person." *Id.* § 21.11(a)(1), (c).

The indictment in this case alleged that from May 29, 2015, through August 24, 2015, Williams committed two or more acts of sexual abuse against K.R. during a period that was 30 days or more in duration while she was younger than fourteen. Regarding the acts of sexual abuse, the indictment alleged that he committed aggravated sexual assault by intentionally and knowingly causing the penetration of her sexual organ with his sexual organ and committed indecency with a child by touching her body with his genitals or touching her genitals with the intent to gratify his sexual desire.

14

When challenging the sufficiency of the evidence, Williams argues that there was insufficient evidence to establish "multiple instances of sexual abuse . . . over thirty or more days." As support, Williams highlights that although K.R. provided details concerning four particular acts, she did not provide dates for those incidents and was not sure when they happened. Although Williams acknowledges that the officer who interviewed him provided a timeline of abuse that spanned from May 2015 to December 2015, he asserts that the officer's estimate was based on K.R.'s outcry that the abuse happened when she was twelve and thirteen. Additionally, Williams highlights that Batshon testified that she had a falling out with Mother shortly after starting to babysit and did not babysit Mother's children or talk to Mother after the falling out. Building on the preceding, he claims that the evidence from Batshon demonstrates that Williams and she were not babysitting the children during the alleged time and that, therefore, he would not have had access to the children.

Next, Williams argues that Mother provided conflicting testimony about when she worked at the job that required her to work overnights and later admitted that she worked that job in the summer of 2013, which was before Batshon and he moved next door. Additionally, he emphasizes that Cousin's Wife testified that she and Cousin watched the children while Mother worked the overnight job. Williams asserts that for his conviction to have been proper the evidence would have had to show abuse occurring from May 29, 2015, through August 24, 2015, as alleged in the indictment. Based on the preceding, he argues that the evidence presented at trial "required the jury to speculate on whether the commission of the abuse acts occurred over a thirty-day timeframe during those months." For these reasons, he urges that the evidence was insufficient to support his conviction.

15

As an initial matter, we note that although Williams refers to the period alleged in the indictment and asserts that the evidence must establish that the abuse occurred during that time, "[i]t is well settled that the 'on or about' language of an indictment allows the State to prove a date other than the one alleged in the indictment as long as the date is anterior to the presentment of the indictment and within the statutory limitation period." *See Sanchez v. State*, 400 S.W.3d 595, 600 (Tex. Crim. App. 2013) (quoting *Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997)). Moreover, there is no statute of limitations for continuous sexual abuse. Tex. Code Crim. Proc. art. 12.01(1)(D). The indictment in this case was issued in 2018. Moreover, K.R. was born in September 2002 and would not have turned fourteen until September 2016. Accordingly, provided that the jury could reasonably infer from the evidence that two or more acts of sexual abuse occurred before September 2016 during a period that is 30 or more days in duration, then the evidence was sufficient to support his conviction. *See* Tex. Penal Code § 21.02(b); *Stahmann*, 602 S.W.3d at 577.

To the extent that Williams has highlighted alleged inconsistencies in the record concerning when Mother had a job that required her to work overnight and regarding when Williams and Batshon babysat K.R. and her siblings, the jury was tasked with deciding what weight to give the testimony presented at trial. *Stahmann*, 602 S.W.3d at 577. Moreover, we must presume that the jury resolved any conflicts in the evidence in favor of the verdict and defer to that resolution. *Merritt*, 368 S.W.3d at 525-26.

Additionally, the evidence at trial indicated that Williams and Batshon did not babysit the children only when Mother worked overnight. In her testimony, Mother explained that Batshon and Williams watched the children while she worked at different jobs and ran errands. Similarly, K.R. testified that Williams and Batshon watched her and her siblings when

16

Mother had to run errands or took a nap. K.R. also testified that Mother had many jobs and that Williams and Batshon would watch her and her siblings when Mother worked and did not state that babysitting occurred only during one job. Further, although there was testimony concerning various fallings out between the two families, Williams acknowledged that the children were still coming to his house in 2014 and that K.R. spent the night in his home in June 2015. Moreover, Williams, Batshon, K.R., and L.R. all testified that there were times when the children would be alone with Williams.

In her testimony, K.R. testified that she was eleven or twelve when Williams and Batshon started babysitting her and that the babysitting lasted for a year and a half. Further, K.R. related that she waited to disclose the abuse until a few months after the last incident and until after she had moved into Grandmother's home, and K.R. stated that she made the outcry in 2016 when she was in seventh grade. Moreover, the officer who interviewed K.R. testified that the report to the police was made on October 23, 2016. From this evidence and the evidence that K.R. was born in September 2002, the jury could have reasonably inferred that K.R. was younger than fourteen at the time of the last incident of abuse. *See Eustis*, 191 S.W.3d at 884; *see also Smith v. State*, No. 05-03-01282-CR, 2004 WL 1089206, at *12 (Tex. App.—Dallas May 17, 2004, no pet.) (op., not designated for publication) (determining that evidence was sufficient to establish that victim was younger than fourteen based on her birthday and evidence concerning when other events occurred).

K.R. recalled that the sexual abuse occurred for "close to a year," from which a rational juror could have inferred that the first and last incidents were separated by more than thirty days. Although she could not remember if the year was 2013, 2014, or 2015, she testified that the abuse started when she was in sixth grade. Regarding the abuse, she provided extensive

17

details concerning four incidents, and three of those constituted acts of sexual abuse as alleged in the indictment: Williams's inserting his penis into her vagina, touching her vagina, and his lying behind her and placing his erect penis against her. Further, she provided more general descriptions of incidents that happened on multiple occasions that also qualified as acts of sexual abuse as alleged. First, she described how he would place her in his lap and place her hands on his erect penis. In addition, she stated that he would regularly touch her with his penis any time that he could. K.R.'s testimony that she was sexually abused was corroborated by the testimony from L.R., who described hearing sounds consistent with sexual abuse, and Batshon, who testified that he admitted to placing his penis on the side of K.R.'s vagina. Additionally, Stepdaughter related similar acts of abuse that occurred when she was close to K.R.'s age.

Although Williams correctly points out that K.R. did not provide specific dates for any of the alleged acts of abuse, there need only be sufficient evidence presented "to allow the jury to determine whether the crimes occurred during a period that was thirty days or more." *See* Tex. Penal Code § 21.02(b)-(d); *Oliver v. State*, No. 10-12-00389-CR, 2014 WL 1016244, at *11 (Tex. App.—Waco Mar. 13, 2014, no pet.) (mem. op., not designated for publication); *see also Casey v. State*, 349 S.W.3d 825, 829 (Tex. App.—El Paso 2011, pet. ref'd) (explaining that jury "need not unanimously agree on which specific acts of sexual abuse the defendant committed, because those acts are merely the manner and means by which the 'series' element was accomplished"); *Williams v. State*, 305 S.W.3d 886, 890 n.7 (Tex. App.—Texarkana 2010, no pet.) (explaining that child's inability to recall exact dates abuse occurred "is precisely the kind of situation the Legislature considered when it enacted" continuous-sexual-abuse statute).

Based on the evidence presented at trial, the jury could have reasonably determined that the sexual abuse occurred over a period of months and that two or more of the

18

acts described occurred over a period of 30 or more days.[4] *See* Tex. Penal Code § 21.02(b); *see also Oliver*, 2014 WL 1016244, at \*11 (explaining that "[a]lthough the child victims in this case were unable to articulate the exact times and dates of the sexual abuse perpetrated by appellant, there was sufficient evidence to allow the jury to determine whether the crimes occurred during a period that was thirty days or more after September 1, 2007"); *Vergara v. State*, No. 04-12-00187-CR, 2013 WL 749774, at \*7 (Tex. App.—San Antonio Feb. 27, 2013, pet. ref'd) (mem. op., not designated for publication) (finding evidence sufficient even though no exact dates were given where victim "testified in detail to multiple instances of abuse spanning between her third grade and fourth grade school years" and where victim's "testimony indicated a period of time that was more than thirty days in duration").

For these reasons, we conclude that the evidence was sufficient to support William's conviction for continuous sexual abuse and, therefore, overrule Williams's first issue on appeal. *See* Tex. Penal Code § 21.02.

---

[4] In his brief, Williams notes that one of our sister courts overruled a sufficiency challenge in a continuous sexual abuse case where the victim was unable to provide specific dates on which the abuse occurred; however, he contends that the appellate court upheld the conviction because there were "benchmarks to establish that the charged offense occurred in a timeframe of more than thirty days." *See Michell v. State*, 381 S.W.3d 554, 561-64 (Tex. App.—Eastland 2012, no pet.) (noting that victim provided details about what grade she was in, what season it was, or which home family was living in at time of abuse and that records showed when family moved to different houses). Williams contends that there are no similar benchmarks in this case and that without them, the jury lacked the ability to establish a timeframe for the alleged offense. However, for the reasons set out above, we believe that the evidence at trial did provide the jury a basis from which it could rationally determine the duration of the abuse and whether two or more acts occurred during a period of 30 or more days. *See* Tex. Penal Code § 21.02(b).

**Stepdaughter's Testimony**

In his second issue on appeal, Williams contends that the trial court erred by allowing the State to call Stepdaughter as a witness to testify regarding sexual abuse he allegedly committed against her.

The State sought to call Stepdaughter as a rebuttal witness when Williams rested his case-in-chief. The trial court held a hearing outside the presence of the jury to discuss the request. At the hearing, Stepdaughter explained that when she was nine in 1998 or 1999 while Williams was her stepfather, he started rubbing his penis on her and continued that type of abuse for a few years. Further, she related that approximately six months after the abuse started Williams also penetrated her vagina and anus with his penis on the same day. Although she testified that she told her mother about the abuse after her mother and Williams separated, Stepdaughter stated that no report was made to the police.

Following Stepdaughter's testimony, the State argued at the hearing that the evidence was admissible to rebut the defensive theory that K.R. and her family made up the claims against Williams to protect Cousin and to rebut Williams's testimony that he did not touch anyone inappropriately. Further, the State explained that it did not learn of the allegations involving Stepdaughter until a week before trial, and Williams agreed that is also when he was notified. In his response, Williams argued that there were no "unique particulars" for the extraneous offenses occurring over twenty years earlier that would show that K.R. was not fabricating her claims or provide a nexus to the current claims. He also emphasized that there was no police investigation into Stepdaughter's claims and that there was nothing to corroborate her accusation. After considering the parties' arguments, the trial court overruled Williams's objection and allowed the State to call Stepdaughter as a rebuttal witness.

On appeal, Williams concedes that "the defense made clear that it believed that the allegations against Williams had been fabricated" and that "Williams opened the door to admission of extraneous-offense evidence to rebut his defensive theory of fabrication." However, he asserts that it was improper for Stepdaughter to testify because the extraneous offenses that she described were not "'sufficiently similar' to the alleged offense to satisfy a threshold test for admission" under Rule of Evidence 404(b). On the contrary, he contends that "there is a dearth of evidence showing similarity between the assaults described by" Stepdaughter and those described by K.R. Although he acknowledges that both witnesses "were children when the abuse occurred," alleged that he "rubbed his penis against them during the acts," and asserted that he penetrated them with his penis, he urges that these similarities were not sufficient to warrant admission of the extraneous-offense evidence and instead constituted "usual and generic" acts rather than "signature events."

Further, he argues that there were several dissimilarities, including his lack of a family relationship with K.R., his more limited access to K.R., Stepdaughter's younger age during the assaults, and Stepdaughter's lack of testimony concerning when and where the abuse occurred and if there were other people around. Additionally, he notes that unlike the present case, no police investigation occurred regarding the abuse described by Stepdaughter and that he was not charged with abusing Stepdaughter. For these reasons, he contends that the trial court erred by allowing Stepdaughter to testify under Rule 404(b).

Appellate courts review a trial court's ruling regarding the admission or exclusion of evidence for an abuse of discretion. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). Under that standard, a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside "the zone of reasonable disagreement,"

21

*Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is "arbitrary or unreasonable," *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). Moreover, the ruling will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct under any theory of law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). In addition, an appellate court reviews the trial court's ruling in light of the record before the court "at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.).

Under the Rules of Evidence, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but this type of "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b). "Rule 404(b)[2] . . . is a rule of inclusion rather than exclusion," *Chaparro v. State*, 505 S.W.3d 111, 115-16 (Tex. App.—Amarillo 2016, no pet.), and the "enumerated exceptions" listed under Rule 404(b)(2) "are neither mutually exclusive nor collectively exhaustive," *Torres v. State*, 543 S.W.3d 404, 420 (Tex. App.—El Paso 2018, pet. ref'd). Accordingly, courts have explained that "extraneous-offense evidence, under Rule 404(b), is admissible to rebut a defensive theory raised in an opening statement or raised by the State's witnesses during cross-examination." *Bargas v. State*, 252 S.W.3d 876, 890 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). "Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (quoting *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)).

22

One type of defensive theory which extraneous-offense evidence may be admitted to rebut is a defensive theory that a complainant in a sexual abuse case "fabricated her allegations" against the defendant. *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008). In that type of case, extraneous-offense evidence of other sexual abuse by the defendant may be admitted provided that the extraneous misconduct is "similar to the charged one and an instance in which the 'frame-up' motive does not apply." *Wheeler v. State*, 67 S.W.3d 879, 887 n.22 (Tex. Crim. App. 2002). The requirement of similarity to rebut this type of defensive theory does not require "exacting similarity." *Dennis v. State*, 178 S.W.3d 172, 179 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *see also Newton v. State*, 301 S.W.3d 315, 318 (Tex. App.—Waco 2009, pet. ref'd) (noting that requisite degree of similarity is not as exacting for rebutting defensive theory of fabrication as is necessary when evidence of extraneous offense is offered to prove identity by showing defendant's system or modus operandi).[5]

---

[5] We note that article 38.37 of the Code of Criminal Procedure contains a statutory exception to Rule 404 for trials of certain sexual offenses, including continuous sexual abuse of a child, and provides that evidence that a defendant has committed a sexual offense against a different child may be admitted "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." Tex. Code Crim. Proc. art. 38.37, § 2. No argument was made at the hearing regarding whether the evidence could be admitted under article 38.37. Even though we ultimately conclude that the evidence was admissible under Rule 404, we do note that the trial court's ruling arguably could be upheld under article 38.37 even though the State did not learn of the extraneous offenses or notify Williams until one week before trial. *See* Tex. Code Crim. Proc. art. 38.37, §§ 2-a, 3 (requiring hearing be held outside presence of jury to allow trial court to determine whether evidence "will be adequate to support finding by the jury that the defendant committed the separate offense beyond a reasonable doubt" and requiring State to give notice of intent to introduce evidence no later than 30th day before trial for evidence it intends to introduce in its "case in chief"); *see also Lewis v. State*, 693 S.W.3d 453, 469 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd) (finding "no merit" to assertion that evidence should not have been admitted under article 38.37 on ground that notice provision was not complied with because "notice is required only when the State intends to introduce the evidence in its case in chief" and because witness testified as rebuttal witness "to rebut the defensive theory of fabrication"); *Romano v. State*, 612 S.W.3d 151, 159 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd)

We agree with Williams that he presented a defensive theory that the allegations against him were fabricated due to animosity from Mother and her family toward him and due to Mother's family not wanting to accuse Cousin of committing the abuse. *See Bargas*, 252 S.W.3d at 890. For example, during his cross-examination of Grandmother, Williams asked whether K.R. would lie for Mother and about whether K.R. had lied in the past. *See Banks v. State*, 494 S.W.3d 883, 893 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (determining that trial court did not abuse its discretion by concluding that defendant opened door for evidence regarding extraneous offense to rebut defensive theory of fabrication where defendant raised theory through cross-examination of victim). While cross-examining Batshon, Williams elicited testimony about a feud between her family and Mother's family, about how she had made a report about Mother giving her marijuana and having K.R deliver it, and about how she reported Mother to the Department for neglect. Additionally, while cross-examining Mother, he elicited testimony that Cousin watched her children, that Williams got into an altercation with Mother's ex-boyfriend before K.R. made her outcry, and that Mother was able to work with her landlord to move without having to pay a new deposit after showing her landlord the police report concerning the allegations in this case.

When Williams questioned Mother, she admitted that L.R. made an outcry concerning Cousin around the same time that K.R. made her outcry about Williams but that

___

(explaining that adequate in this context means legally sufficient); *Young v. State*, No. 01-23-00154-CR, 2024 WL 4045783, at *9 n.17 (Tex. App.—Houston [1st Dist.] Sept. 5, 2024, pet. ref'd) (mem. op., not designated for publication) (noting that article 38.37 "does not require the trial court to make an explicit" reasonable-doubt finding concerning proffered extraneous offense evidence); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd) (explaining that under article 38.07 complainant's testimony alone is sufficient to establish beyond reasonable doubt offenses of aggravated sexual assault of child and indecency with child).

Mother did not make a report to the police concerning the claims about Cousin. Moreover, Williams questioned Cousin's Wife who stated that Cousin and Mother were close, that Mother was manipulative, and that Mother used her children for her own ends. Additionally, Williams questioned L.R. about the abuse by Cousin and about whether she would lie if asked to by K.R. In his testimony, Williams related that tension had been building between the two families before K.R. made her outcry; that he called the Department, the police, and the children's school to make reports concerning Mother's parenting; and that he got into an argument with one of Mother's ex-boyfriends. Williams described Mother as manipulative and said K.R. lied about the abuse. Further, he claimed that he was "not a child molester" and "never touched nobody" and that Cousin was the actual offender. *See Webb v. State*, 575 S.W.3d 905, 909-10 (Tex. App.—Waco 2019, pet. ref'd) (deciding that trial court did not abuse its discretion by determining that defendant raised issue of fabrication through voir dire and cross-examination of witnesses).

Concerning the similarity between the extraneous offenses and the charged conduct, we note that both the extraneous offenses and the charged offense involved young girls who were similar in age for some if not all of the time that the abuse occurred. Stepdaughter related that she was nine when the abuse started and that the abuse continued for years. Although K.R. did not provide her age at the time of the abuse, the jury could have inferred from the evidence that K.R. was younger than fourteen at the time of the last incident. Further, even though K.R. did not testify that she was nine when the abuse started, she specified that the abuse began after Williams moved next door to her and after Williams and Batshon started babysitting her when she was eleven or twelve. *See Deggs v. State*, 646 S.W.3d 916, 926 (Tex. App.— Waco 2022, pet. ref'd) (noting in rule 403 analysis pertaining to evidence admitted under article

25

38.37 that victim in charged offense was eleven and that victim in extraneous offense was twelve); *Webb*, 575 S.W.3d at 910 (explaining that extraneous offenses were similar to charged offense where victim in charged offense was sixteen, where victim in first extraneous offense was thirteen, and where victim in second extraneous offense was eight when abuse started and was twenty-one when it ended); *Banks*, 494 S.W.3d at 893 (noting that two victims were "young females between the ages of 11 and 15 at the time of perpetration" when deciding if extraneous offense was sufficiently similar). Moreover, both K.R. and Stepdaughter described abuse that occurred when Williams was an adult. *See Banks*, 494 S.W.3d at 893 (emphasizing that defendant was adult when charged offense and extraneous offense occurred).

In addition, the abuse of both victims occurred over an extended period. Stepdaughter testified that it occurred for years, and K.R. said that the abuse occurred for almost a year and that it stopped after she moved out of Mother's home and away from Williams. *See Newton*, 301 S.W.3d at 318 (noting similarity that defendant abused victim in charged offense and victim in extraneous offense for years).

Finally, the type of abuse described by K.R. and Stepdaughter was similar. They both testified regarding Williams's rubbing his penis on them or touching them with it. *See Webb*, 575 S.W.3d at 910 (highlighting that victim in charged offense and victims in extraneous offenses all described defendant's rubbing on their bodies). Additionally, even though they both described abuse that was ongoing, they each described only a single incident of abuse in which Williams inserted his penis inside them. Further, the abuse occurred when Williams was acting as a caretaker for K.R. and for Stepdaughter.

On appeal, Williams contends that these similarities are insufficient and cites *Dennis v. State*, in which our sister court of appeals determined that the extraneous offense was

sufficiently similar to the one charged when explaining that the admission of the extraneous evidence was not error. 178 S.W.3d at 179. In that case, the extraneous and charged offenses had victims who were teenage girls known to the defendant, occurred on a couch in his living room, happened during the same summer, and involved circumstances in which defendant did not say much to either victim during the sexual assaults. *Id.* We do not read *Dennis* as suggesting that it had identified any type of similarity that *must* be present before an extraneous offense may be admitted under Rule 404, nor do we read the analysis from that case as suggesting that the type of similarities present here could not suffice. *See id.*; *see also Sutton v. State*, 706 S.W.3d 482, 489 n.2 (Tex. App.—Austin 2024, no pet.) (noting that cases from sister intermediate courts of appeals are not binding precedent). On the contrary, another court of appeals has determined that a trial court did not abuse its discretion by admitting evidence of an extraneous offense even though the degree of similarity was less than that present here. *See Banks*, 494 S.W.3d at 893 (determining that extraneous offense was sufficiently similar where "the record reveals both the extraneous offense and the charged offenses involved young females between the ages of 11 and 15 at the time of the perpetration; both occurred while appellant was an adult; and both involved sexual contact between appellant and the complainants").

For these reasons, we conclude that the trial court did not abuse its discretion by overruling Williams's objection and allowing the State to present evidence pertaining to the extraneous offenses involving Stepdaughter under Rule 404. *See* Tex. R. Evid. 404(b); *Banks*, 494 S.W.3d at 893. Accordingly, we overrule Williams's second issue on appeal.

**K.R.'s Medical Records**

In his final issue, Williams contends that the trial court erred by excluding K.R.'s mental-health records made years after the alleged abuse.

In a hearing outside the presence of the jury during Williams's case-in-chief, Williams explained that he wanted to call Lisa Helms as the custodian of records for West Texas Guidance and Counseling for the purpose of laying a predicate to admit K.R.'s counseling records from 2017 to the time of trial. Williams explained that he wanted to offer the evidence to show whether K.R.'s conduct was in conformity with the behavior that the State's expert witness testified victims can display. The State objected on multiple grounds, including that the records were hearsay. Williams responded by arguing that the documents contained statements made for a medical purpose, which made the documents admissible as an exception to the prohibition against hearsay. As an example, Williams identified one of the records by K.R.'s psychiatrist from when K.R. was twenty-one, which reflected that she was being treated by the doctor for depression and anxiety and described abuse by her neighbor from ages seven to eleven. Williams asserted that this time period was before he moved next to Mother and her children. Williams informed the trial court that he wanted Helms to testify before the jury and then have the trial court rule on the admissibility of the records, and the trial court agreed.

In her testimony during trial, Helms testified that she worked in the accounting department for West Texas Counseling and Guidance and that Williams previously sought some records from the counseling company. She also explained that the company's records were made around the same time that a patient was seen. Regarding the records at issue, she related that they were records pertaining to K.R. from December 2017 to May 2019 and from December

28

2023 to August 2024. Helms admitted that she had no personal knowledge about anything contained in the records and was not a clinician.

Williams asked the trial court to admit the records, and the State objected on multiple grounds, including that the records constituted hearsay. Further, the State argued that the records did not qualify as an exception to hearsay for statements made for medical diagnosis or treatment because nothing in the records indicated that K.R. was aware that truth-telling was a vital component of the therapy involved. Williams responded that the medical-purpose exception did apply and that a medical doctor created the records. The trial court denied Williams's request to admit the records.

On appeal, Williams contends that the trial court's ruling was improper because the records were admissible under the medical-purpose exception to hearsay. Specifically, he argues that the statements included in the records were made for the purpose of medical treatment and that the records were prepared by a doctor treating K.R. for depression and reflected the doctor's observations and conclusions. Further, he contends that "[w]e may assume that [K.R.] appreciated that the effectiveness of her diagnosis or treatment depended on the accuracy of the information provided." Additionally, he asserts that the records pertained to his "defensive theory that the allegations of abuse had been fabricated" and speculates that the records "might have . . . shed light on whether the alleged victim's outcry was consistent from beginning to end." Moreover, he contends that the records would have allowed the jury to consider whether K.R. showed behaviors consistent with prior abuse as described by the State's expert.

Because this issue, like the previous one, challenges an evidentiary ruling, we review the trial court's ruling for an abuse of discretion. *See Tillman*, 354 S.W.3d at 435. Under

29

the Rules of Evidence, hearsay is a statement that "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the statement." Tex. R. Evid. 801(d). Hearsay is not admissible unless provided otherwise by "a statute," the Rules of Evidence, or "other rules prescribed under statutory authority." *Id.* R. 802. The following type of statement is excluded from the rule against hearsay: "A statement that . . . is made for—and is reasonably pertinent to—medical diagnosis or treatment . . . and . . . describes medical history; past or present symptoms or sensations; their inception; or their general cause." *Id.* R. 803(4).

The exception contained in Rule 803(4) is based on the patient's selfish motive in receiving appropriate medical treatment, *Jones v. State*, 92 S.W.3d 619, 623 (Tex. App.—Austin 2002, no pet.), *overruled in part on other grounds by Taylor v. State*, 268 S.W.3d 571, 589 (Tex. Crim. App. 2008), and on "the assumption that the declarant appreciates that the effectiveness of the diagnosis or treatment may depend on the accuracy of the information provided," *Munoz v. State*, 288 S.W.3d 55, 58 (Tex. App.—Houston [1st Dist.] 2009, no pet.). The assumption that someone seeking medical treatment will tell the truth may not always apply to children because they may not fully understand "the need to be truthful with a physician." *See Barnes v. State*, 165 S.W.3d 75, 82 (Tex. App.—Austin 2005, no pet.).

In order for evidence to be admissible under this exception, "the proponent normally must show that (1) the declarant 'was aware that the statements were made for purposes of medical diagnosis or treatment and that proper diagnosis or treatment depended upon the veracity of the statements' and (2) 'the statements are pertinent to diagnosis or treatment, i.e., that it was reasonable for the care provider to rely on the statements in diagnosing or treating the declarant.'" *State v. Sanchez*, 722 S.W.3d 58, 70-71 (Tex. App.—Fort Worth 2025, pet. ref'd)

30

(quoting *Lumsden v. State*, 564 S.W.3d 858, 883 (Tex. App.—Fort Worth 2018, pet. ref'd)); *see Mbugua v. State*, 312 S.W.3d 657, 670-71 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

For purposes of Rule 803(4), the Court of Criminal Appeals in *Taylor v. State* distinguished between medical treatment or diagnoses "in the emergency room in the immediate aftermath of an injury or on the physician's cold examination table in the interest of diagnosing and curing some exigent disease or ailment" and mental-health treatment or diagnoses from "reclining on a therapist's or psychiatrist's couch." 268 S.W.3d at 589. In the first context, "it seems only natural to presume that adults, and even children of a sufficient age or apparent maturity, will have an implicit awareness that the doctor's questions are designed to elicit accurate information and that veracity will serve their best interest." *Id.* "This explains the almost universal tendency of courts under these circumstances to assay the record, not for evidence of such an awareness, but for any evidence that would *negate* such an awareness, even while recognizing that the burden is on the proponent of the hearsay to show that the Rule 803(4) exception applies." *Id.*; *see Sanchez*, 722 S.W.3d at 71.

In contrast, for mental-health contexts, the presumption that patients understand that truth serves their best interest "is far less compelling." *Taylor*, 268 S.W.3d at 590. "It is not always so readily apparent (indeed, it may not always be *accurate*) in the mental-health context that truth-telling is vital." *Id.* "Not even an older, more mature child (maybe not even an adult) will necessarily recognize and appreciate the necessity (assuming there is a necessity) always to tell a mental-health provider the truth in order to assure the efficacy of treatment." *Id.* Accordingly, in the mental-health context, "it is incumbent upon the proponent of the hearsay exception" to establish that "1) that truth-telling was a vital component of the particular course of therapy or treatment involved, and 2) that it is readily apparent that the child-declarant was aware

31

that this was the case." *Id.*; *see also Munoz*, 288 S.W.3d at 58 (discussing requirements for statements made by child to therapist and noting need for additional information for statement to be admissible in context of long-term, ongoing, after-the-fact mental-health treatment). "Otherwise, the justification for admitting the out-of-court statement over a valid hearsay objection is simply too tenuous." *Taylor*, 268 S.W.3d at 590; *see id.* at 588.

In this case, Williams sought to have admitted records from K.R.'s counseling sessions and pertaining to her treatment for depression that spanned a period of years and occurred years after the abuse stopped. Although Williams discussed as an example one record from when K.R. was twenty-one, he also sought to offer records from 2017 to 2019 when K.R was still legally a child. Moreover, nothing in Helms's testimony reflected that truth-telling was a vital component of the particular therapy involved or that K.R. was aware that was the case. *See id.* at 590. Although K.R. testified during her cross-examination that she discussed the abuse with two counselors, she did not provide additional details concerning the therapy. When discussing counseling at West Texas Guidance and Counseling, K.R. stated that she did not really provide details of the abuse because she was a child "at the time" that she saw the first counselor and because she did not see the other counselor "for very long." Although she mentioned seeing a psychiatrist at West Texas Counseling and Guidance, she did not provide any more information concerning the type of therapy or treatment that she received from him.

Regardless of whether the requirements set out in *Taylor* for the admission of statements pertaining to the treatment or diagnosis for mental-health issues applied to the records from when K.R. was an adult, *see id.* (noting that adults might not recognize need to be truthful in context of treatment or diagnosis for mental-health issues), the trial court could have reasonably concluded that the requirements did apply to the records from when K.R. was a child

32

and that those requirements were not met here, *see id.* at 591 (noting that statements concerning identity of abuser, "long after the facts of the abuse," made "in an on-going course of mental-health treatment or therapy" was not necessarily pertinent to treatment, particularly if offender was not "a family or household member," and that proponent of hearsay exception should "make the record reflect that it was important to the efficacy of the treatment"); *see also Stevens v. State*, 234 S.W.3d 748, 784 (Tex. App.—Fort Worth 2007, no pet.) (determining that six-year-old child's statement to social worker was not admissible under Rule 803(4) because "[t]he record" was "devoid of any evidence that [child] understood why she was in therapy or that she needed to be truthful in her statements" to social worker). Moreover, Williams sought to admit all of the records from K.R.'s therapy for those four years and did not attempt to separately admit the records from when K.R. was an adult. *See Jones v. State*, 843 S.W.2d 487, 492 (Tex. Crim. App. 1992) (noting that trial court should never be required to sift through challenged evidence "in order to segregate the admissible from the excludable" and that "[i]f evidence is offered and challenged which contains some of each, the trial court may safely admit it all or exclude it all, and the losing party, no matter who he is, will be made to suffer on appeal the consequences of his insufficiently specific offer or objection").

Additionally, when requesting the admission of all records for years 2017 to 2019 and 2023 to 2024, Williams did not identify how all those documents contained statements made for medical diagnosis or treatment and described medical history, past or present symptoms or sensations, their inception, or their general cause. *See* Tex. R. Evid. 803(4); *Jones*, 843 S.W.2d at 492; *see also State v. Lasalle*, 135 S.W.3d 94, 97 (Tex. App.—Corpus Christi-Edinburg 2003, pet. ref'd) (determining that trial court did not abuse its discretion by determining it should not have admitted under hearsay exception medical records reflecting that wife stated her injuries

33

were caused by defendant assaulting her by hitting her with his fists because evidence showed that her medical treatment would have been same "regardless of how injury occurred"). Even if some statements in those records might have been admissible under Rule 803(4), the trial court could have reasonably concluded that Williams had not shown that all the statements were. *See Jones*, 843 S.W.2d at 492; *see also Mbugua*, 312 S.W.3d at 671 (affirming trial court's decision to redact portion of medical record stating that defendant said he injured his hand "*in a fight*" because defendant did not explain why it was important for medical professionals to know that cut was from "a fight" or how that "information was important for his treatment").

For these reasons, we conclude that the trial court did not abuse its discretion by not admitting the records under Rule of Evidence 803(4). *See* Tex. R. Evid. 803(4). Accordingly, we overrule Williams's last issue on appeal.

## CONCLUSION

Having overruled all of Williams's issues on appeal, we affirm the trial court's judgment of conviction.

_____

Karin Crump, Justice

Before Chief Justice Byrne, Justices Crump and Ellis

Affirmed

Filed: March 27, 2026

Do Not Publish

34